**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joe W. FOUNTAIN (92–1507); Carlton B.
McEaddy (92–1866); Defendants–
Appellants.**

**Nos. 92–1507, 92–1866.**

United States Court of Appeals,
Sixth Circuit.

Argued March 19, 1993.

Decided Aug. 9, 1993.

Kathleen Moro Nesi, Asst. U.S. Atty., Detroit, MI (argued and briefed), for plaintiff-appellee.

William Luther Glenn, Detroit, MI (argued and briefed), for defendant-appellant, in No. 92-1507.

Paul Borman (argued and briefed), Andrew Patton, Federal Public Defenders Office, Detroit, MI, for defendant-appellant in No. 92-1866.

Before: MILBURN and RYAN, Circuit Judges; and COFFIN, Senior Circuit Judge.*

RYAN, Circuit Judge.

In this appeal from the joint prosecution of defendants Joe W. Fountain and Carlton B. McEaddy, we examine a total of five assignments of error; two advanced by McEaddy, and three by Fountain.

Carlton B. McEaddy pled guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He appeals the district court's order denying his motion to suppress statements on the basis that they were obtained as a result of an illegal seizure. The issues in McEaddy's appeal are:

1) Whether the district court properly concluded that McEaddy's Fourth Amendment rights were not violated when he was detained during the search of a friend's home; and

2) Whether the district court properly concluded that the continued detention of McEaddy after the search was completed was reasonable under the Fourth Amendment.

Because we find that McEaddy's Fourth Amendment rights were not violated, we shall affirm the district court's order denying the motion to suppress.

Joe W. Fountain appeals his judgment of conviction and sentence for: 1) possession with intent to distribute cocaine within 1,000 feet of a school, in violation of 21 U.S.C. §§ 841(a)(1) and 860; 2) use of a firearm in relation to a drug-trafficking offense, in violation of 18 U.S.C. § 924(c); and 3) destruction of property to prevent seizure, in violation of 18 U.S.C. § 2232(a). Fountain's issues on appeal are:

* The Honorable Frank M. Coffin, Senior Circuit Judge of the United States Court of Appeals for the First Circuit, sitting by designation.

3) Whether the district court erred when it received in evidence testimony regarding Fountain's prior drug-related activities;

4) Whether the district court erred when it received in evidence alleged hearsay testimony; and

5) Whether the district court properly departed from the recommended guideline range.

Although the district court's evidentiary rulings in 3) and 4) above were in error, we believe the errors were harmless. Furthermore, we conclude that the district court acted within its discretion when it departed from the recommended guideline range in determining Fountain's sentence. Therefore, we also shall affirm Fountain's conviction and sentence.

## I.

On May 8, 1991, agents from the Bureau of Alcohol, Tobacco, and Firearms executed a search warrant at Fountain's residence in Detroit, Michigan. Upon entering Fountain's home, ATF Agent Roger Guthrie observed Fountain run from the bedroom to the bathroom, remove caps from two pill bottles, dump the contents in the toilet, flush the toilet, and throw the bottles into the bathtub. Agents searched the bathroom and found two empty pill vials, two caps, and a single cocaine rock in the bathtub. They also seized several semi-automatic weapons from the bedroom. Fountain admitted to the agents that he lived in the residence and that he owned the guns discovered in the bedroom.

One month later, on June 4, ATF agents executed a second search warrant at Fountain's home. The agents discovered four individuals in the house—Fountain, McEaddy, Selma Hill, and Gregory Jackson. The agents detained all four persons while they conducted a search of the premises. They discovered four rocks of cocaine in Fountain's pocket and three firearms in the hall closet. In response to a question by one of the agents, McEaddy, a convicted felon, admitted that he had "handled" the firearms found in the house.

In due course, a grand jury indicted Fountain and McEaddy for narcotics and gun violations. McEaddy moved to sever his case from Fountain's and to suppress statements he had given to the agents. At the hearing on the motion to suppress, McEaddy argued that his statement regarding the firearms was coerced and that it was the result of an illegal arrest. The district court granted McEaddy's motion to sever but denied his motion to suppress. McEaddy pled guilty to being a felon in possession of a firearm, but reserved the right to appeal the district court's decision denying his motion to suppress. He was sentenced to a 16–month prison term.

Fountain was convicted by a jury on January 29, 1992. The jury found Fountain guilty on four counts of drug and firearms violations. The presentence report determined that the applicable sentence range was 33–41 months for three counts of drug violations. The report recommended an upward departure from this range because Fountain's criminal history category did not accurately reflect his criminal history. The district court agreed and sentenced Fountain to 46 months imprisonment. The court also imposed a consecutive mandatory sentence of 60 months for the conviction on the firearms charge.

## II.

### McEADDY

At the hearing on McEaddy's motion to suppress, two ATF agents, Roger Guthrie and Michael Yott, testified consistently about the search warrant executed at Fountain's home on June 4. According to the agents, the warrant authorized them to search for firearms, drugs, and drug paraphernalia. Upon entering the house, the agents conducted a protective sweep and assembled Fountain, McEaddy, Hill, and Jackson in the living room. The agents handcuffed all four persons and forced them to lie face down on the floor. Agent Anthony Primak read them their *Miranda* [1] rights, pausing to allow each of the four an opportunity to express his or her understanding. The agents detained the

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

occupants in the living room while the search was conducted. The agents discovered narcotics in Fountain's pocket and three firearms in the hall closet.

At the conclusion of the search, the agents took each of the four detainees, one at a time, into the adjoining dining room area for a brief interview.[2] Guthrie and Yott testified that the purpose of the dining room interviews was investigative; that is, to determine whether anyone should be detained further. According to the agents, when McEaddy was interviewed in the dining room, he identified himself by his alias, Frank Davis, and admitted that he was a paroled felon. He told the agents that although the weapons that had been found in Fountain's home did not belong to him, McEaddy had "handled" them. The agents immediately terminated the interview and led McEaddy to a second floor bedroom to question him more thoroughly.

Upstairs, Agent Yott once again read McEaddy his *Miranda* rights. According to the agents, McEaddy's handcuffs were removed for the duration of the upstairs interview. McEaddy did not indicate during either interview that he did not wish to answer questions or that he wanted an attorney present. Agent Yott recorded McEaddy's oral statement on a waiver of rights form, which McEaddy signed using the alias Frank Davis. McEaddy stated that he had been staying at Fountain's home for approximately two months and that he had handled or loaded the three weapons seized by the agents.

McEaddy also testified at the hearing, but his testimony contradicted the statement recorded by Yott. According to McEaddy, he was not staying at Fountain's house but had been asked to come over on June 4 to cut the grass and clean the basement. He testified that the agents apprehended him in the kitchen, handcuffed him, and forced him to lie on the floor. Five minutes later, he was moved to the dining room and again told to lie face down on the floor. The agents read

his *Miranda* rights and asked if he understood them. According to McEaddy, only one interview took place and that was in the upstairs bedroom; the agents had not conducted an "initial" interview in the dining room. McEaddy testified that in the upstairs bedroom, Agent Yott transcribed McEaddy's answers on the waiver form, and when McEaddy refused to sign the statement, the agents punched and kicked him. Both agents denied doing so.

Jackson, who was also detained during the June 4th search, testified for McEaddy at the suppression hearing. According to Jackson, the agents kept him on the floor for approximately 30 to 60 minutes before they escorted him upstairs for 20 minutes of questioning. Jackson denied that any interviews took place in the dining room.

McEaddy asked the district court to suppress his statements for two reasons: 1) his written statement and waiver were coerced; and 2) his oral and written statements were the product of an unreasonably prolonged detention and illegal arrest in violation of the Fourth Amendment. The district court denied the motion to suppress, specifically finding that McEaddy's testimony was not credible. *United States v. McEaddy*, 780 F.Supp. 464, 467–68 (E.D.Mich.1991). On appeal, McEaddy abandons the argument that his confession was coerced by the agents. He maintains, however, that his statements resulted from an unlawful arrest.

## A.

In his first assignment of error, McEaddy argues that the ATF agents violated his right to be free from an unreasonable seizure when they detained him while they executed the search warrant. According to McEaddy, the rule of *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)— that law enforcement agents have limited authority to detain "occupants" present on the premises during the execution of a valid

---

**2.** McEaddy claimed that he was not questioned until after the search ended, and the district court assumed that these initial dining room interviews occurred after the search was completed. The record, however, is not clear, and it may be that McEaddy's interview occurred *during* the execution of the search. *United States v. McEaddy*, 780 F.Supp. 464, 471–72 n. 18 (E.D.Mich.1991). However, as did the district court, we shall assume that the interview occurred after the completion of the search.

search warrant—does not apply to him because he was not a resident of the home. Therefore, he argues, his detention was an unlawful arrest not supported by probable cause, and the subsequent confession, a "fruit" of the unlawful arrest, was not admissible into evidence under the exclusionary rule. The government responds that the meaning of "occupant," as that term is used by the Supreme Court in *Summers*, is not limited to "resident," and that the district court properly found that McEaddy's detention during the search was reasonable under the Fourth Amendment.

As a threshold matter, all parties agree that McEaddy's detention in Fountain's home constituted a "seizure" within the meaning of the Fourth Amendment. A seizure of a person occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen...." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16 (1968). McEaddy does not dispute the district court's finding that the agents had probable cause to arrest him once he confessed that he was a convicted felon and had handled the firearms. As in *Summers*, the issue here "involves ... the constitutionality of a pre-arrest 'seizure' which ... was unsupported by probable cause" that occurred during the execution of a valid search warrant. *Summers*, 452 U.S. at 696, 101 S.Ct. at 2591. More specifically, this case requires us to determine whether the rule of *Summers*—that a valid search warrant implicitly carries with it the limited authority to detain the "occupants" of the premises while police conduct the search— applies to McEaddy, a non-resident who was present on the premises.

The district court's determination that "occupant" includes a non-resident on the premises at the time of the search is a legal conclusion. This court applies *de novo* review to the district court's conclusions of law

made in consideration of a motion to suppress. *United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992).

■ The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. Generally, under the Fourth Amendment, an official seizure of a person must be supported by probable cause, even if no formal arrest is made. *Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). However, the Supreme Court has recognized that

> some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment. In these cases the intrusion on the citizen's privacy "was so much less severe." than that involved in a traditional arrest that "the opposing interests in crime prevention and detection and in the police officer's safety" could support the seizure as reasonable.

*Summers*, 452 U.S. at 697–98, 101 S.Ct. at 2591–92 (quoting *Dunaway*, 442 U.S. at 209, 99 S.Ct. at 2255). As a result, the Supreme Court has created " 'narrowly drawn' exception[s] to the probable cause requirement of the Fourth Amendment...." *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) (citation omitted). The first exception was recognized in *Terry v. Ohio* when the Court determined that a police officer's "stop and frisk" of a suspect is reasonable under the Fourth Amendment if the limited stop is supported by "reasonable suspicion" that the suspect is engaging in criminal activity, and if the frisk is supported by "reasonable suspicion" that the suspect is armed and dangerous.[3] *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884.

---

3. In *Terry*, the Supreme Court held:

[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a police-

man and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault

A few years later, the Court held that "when [a border patrol] officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

In *Summers*, the Court recognized a third exception to the probable cause requirement, holding that

> a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

452 U.S. at 705, 101 S.Ct. at 2595 (footnote omitted). In *Summers*, Detroit police officers were about to execute a search warrant for narcotics at Summers's home when they encountered him as he left the house. The police detained Summers, as well as seven others present on the premises, while they executed the search. The police discovered narcotics in the basement. After learning that Summers owned the home, officers arrested Summers and searched him. They discovered 8.5 grams of heroin on his person, and charged him with possession of the heroin. *Id.* 452 U.S. at 693, 101 S.Ct. at 2589. Summers argued that the heroin should have been suppressed because it resulted from his illegal detention during the execution of the search. The Supreme Court disagreed and held that the valid search warrant implicitly provided the officers with limited authority to detain the "occupants" of the premises during the proper search. *Id.* 452 U.S. at 705, 101 S.Ct. at 2595. Building on *Terry* and *Brignoni–Ponce*, the Supreme Court recognized that "some seizures ... constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable

cause, so long as police have an articulable basis for suspecting criminal activity." *Id.* at 699, 101 S.Ct. at 2592. The Court noted that such seizures are "not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* ...." *Id.* at 700, 101 S.Ct. at 2593.

The *Summers* majority first found that detaining the occupants of the house was less intrusive than arresting them, particularly because the police had obtained a search warrant:

> A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself.

*Id.* at 701, 101 S.Ct. at 2593. Second, the Court assessed the justification for the detention and found the law enforcement interests significant. The Court recognized: 1) "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found"; 2) the interest in minimizing the risk of harm to the officers; and 3) the interest in the orderly completion of the search, which may be facilitated because the occupants of the premises are present. *Id.* at 702–03, 101 S.Ct. at 2594. Finally, the Court examined "the nature of the articulable and individualized suspicion on which the police base[d] the detention of [Summers]." *Id.* at 703, 101 S.Ct. at 2594. According to the Court:

> The existence of a search warrant ... provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime.... The connection of an occupant to that home gives the police

---

him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.
*Terry*, 392 U.S. at 30–31, 88 S.Ct. at 1884–85. Thus, *Terry's* holding concerned the protective

"frisk," rather than the investigative seizure of a suspect. In subsequent cases, the Supreme Court upheld the constitutionality of the *Terry* - type investigative stop. *See, e.g., Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984).

officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

*Id.* at 703–04, 101 S.Ct. at 2594. (footnote omitted).

Although McEaddy concedes that *Summers* permits the detention of an "occupant" during the execution of a valid search warrant, he claims that his detention was unlawful because "occupant," as that term is used in *Summers,* refers only to a "resident" of the premises. Although *Summers* involved the detention of the resident whose home was the subject of the valid search, the opinion identified several criteria to guide us in determining whether the detention of McEaddy, a non-resident, was reasonable. Those criteria require us to

1) assess "both the character of the official intrusion and its justification";

2) determine whether the law enforcement interests that justify the detention outweigh the intrusion on McEaddy's person; and

3) determine whether the officers based the decision to detain McEaddy on "articulable and individualized suspicion."

*See id.* at 701–04, 101 S.Ct. at 2593–95.

■ When occupants of a residence are detained during the execution of a search warrant, the circumstances ordinarily will justify more intrusive behavior by the police than in a typical on-the-street detention. When the ATF agents entered Fountain's home pursuant to the warrant to search for narcotics, they faced a confined, unfamiliar environment that was likely to be dangerous. McEaddy and the others were handcuffed and forced to lie face down on the living room floor while the search was conducted. Concern for safety of the agents and the need to prevent disposal of any narcotics on the premises, justified the restraint of the occupants, particularly under the circumstances of this case, where the search was part of a narcotics investigation and weapons

had been seized from the home just one month earlier. The "character" of the intrusion on McEaddy and its "justification" were reasonable and proportional to law enforcement's legitimate interests in preventing flight in the event incriminating evidence is found and in minimizing the risk of harm to officers. Those concerns plainly outweighed the intrusion experienced by McEaddy in being required to be on the living room floor while the search was completed. And those concerns are the same regardless of whether the individuals present in the home being searched are residents or visitors.

■ Finally, we believe that a valid search warrant plus McEaddy's apparently voluntary connection with the home provided the agents with "an easily identifiable and certain basis for determining that suspicion of criminal activity justifie[d] detention," particularly when the agents did not immediately know whether McEaddy was a resident.

Thus, we conclude that the district court correctly rejected McEaddy's argument that the Supreme Court intended that the rule in *Summers* apply only to "residents." *See McEaddy,* 780 F.Supp. at 470.[4] As this court has stated:

When police obtain a warrant to search the home of a citizen, they concomitantly receive certain limited rights to occupy and control the property. Within the bounds of their warrant, the police may enter the property in question, may search for the items described in their warrant, may detain persons found on the premises during the search, and they may take such reasonable action as is necessary to protect themselves during the execution of the warrant. Together with the right to conduct these activities on a citizen's property goes the obligation to do so in a reasonable manner.

*Bills v. Aseltine,* 958 F.2d 697, 704 (6th Cir. 1992). The district court correctly held that the detention of McEaddy during the search

---

**4.** Our conclusion is consistent with the conclusion reached by the Seventh and Ninth Circuits, which have given the term "occupant" under *Summers* a broader reading. *See United States v. Pace,* 898 F.2d 1218, 1239 (7th Cir.), *cert. denied,*

497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 and *cert. denied,* 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990); *United States v. Taylor,* 716 F.2d 701, 707 (9th Cir.1983).

was reasonable under the Fourth Amendment.

**B.**

McEaddy also argues that once the agents completed the search and seized the weapons, his further detention constituted an arrest. Because his "arrest" at the completion of the search was not supported by probable cause, McEaddy argues, it was in violation of the Fourth Amendment. According to McEaddy, his detention was exploited and unduly prolonged, and his confession, which resulted from this "illegal arrest," should have been suppressed. The government responds that the brief detention of McEaddy between the conclusion of the search and his formal arrest was a permissible "*Terry* stop."

In analyzing McEaddy's Fourth Amendment claims, the district court divided the events preceding McEaddy's arrest into three distinct episodes:

> First, the detention of the Defendant during the search. Second, the detention of the Defendant after the completion of the search but before the initial interview. Third, the detention of the Defendant after the completion of the initial interview.

*McEaddy*, 780 F.Supp. at 472. We have determined that the initial detention episode of McEaddy was reasonable. With respect to the third episode—the interrogation in the upstairs bedroom—McEaddy does not challenge the district court's finding that the agents had probable cause to arrest him once they learned that he was a convicted felon who admitted handling the firearms found in the house. The third episode, therefore, would be problematic only if the second episode—the interrogation in the dining room—involved an unreasonable seizure.

With respect to the second episode of detention, the district court found that: 1) at the conclusion of the search, the agents reasonably suspected that McEaddy was in-

volved in criminal activity; 2) "the manner and duration of the investigatory detention in this case was well within the defined ambit of a *Terry* stop"; and 3) the detention and questioning were not unreasonable under the Fourth Amendment. *Id.* at 475. We recognize that the agents lacked probable cause to arrest McEaddy immediately following the conclusion of the search, but we conclude, nevertheless, that his continued detention during the dining room interrogation was reasonable.

As an initial matter, we note that although the district court referred to the dining room or second detention of McEaddy as a "*Terry* stop," that was a mistaken label for what occurred. *Terry v. Ohio* did not address the reasonableness of an investigative detention; rather, its holding addressed the reasonableness of a protective "frisk," that is, a search not supported by probable cause.[5] In cases subsequent to *Terry*, the Supreme Court has held that, under the Fourth Amendment, "a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed ... a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (footnote omitted) (quoting *Brignoni–Ponce*, 422 U.S. at 881, 95 S.Ct. at 2580). According to the Court:

> Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.

5. The *Terry* Court specifically stated:

> We thus decide nothing today concerning the constitutional propriety of an investigative "seizure" upon less than probable cause for purposes of "detention" and/or interrogation. *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. And:

> The crux of this case, however, is not the propriety of [the officer]'s taking steps to investigate [Terry]'s suspicious behavior, but rather, whether there was justification for [the officer]'s invasion of Terry's personal security by searching him for weapons in the course of that investigation. *Id.* at 23, 88 S.Ct. at 1881.

*Berkemer,* 468 U.S. at 439–40, 104 S.Ct. at 3149–50 (footnote omitted). To be sure, courts often refer, mistakenly, to such limited, investigative stops as *Terry* stops.

■ The issue presently before us requires that we determine whether the district court correctly concluded that the continued detention of McEaddy at the conclusion of the search was supported by "reasonable suspicion." To establish that the detention, which was not supported by probable cause, was reasonable, the government must show: 1) that the seizure was based on "reasonable suspicion" of criminal activity; and 2) that the investigative measures used were the least intrusive means reasonably available to dispel the officer's suspicion in a short period of time. *United States v. Winfrey,* 915 F.2d 212, 216 (6th Cir.1990), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991).

■ We review for clear error the district court's factual determination that the agents reasonably suspected that McEaddy was engaged in criminal activity. *United States v. Taylor,* 956 F.2d 572, 576 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992) (*en banc*). To establish that the officers reasonably suspected criminal activity, the government must show

"some minimal level of objective justification" for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause....

*United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citations omitted). The district court determined that the agents possessed "some minimal level of objective justification" for the further investigation of McEaddy, and relied on the following evidence to support its conclusion: 1) a neutral magistrate judge had determined there was probable cause to believe that one or more individuals at the residence was engaged in criminal activity; 2) the residence was a known drug house in

which resided convicted felon Fountain; 3) nothing suggested that McEaddy was a casual visitor; and 4) the search had revealed three firearms and narcotics. The court concluded that "the agents had a reasonable suspicion to believe that any of the four occupants could be connected to this evidence." *McEaddy,* 780 F.Supp. at 475. This finding of "reasonable suspicion" was not clearly erroneous.

Once it established "reasonable suspicion," the government was required to show that the agents used the "least intrusive means reasonably available to verify or dispel the [agents'] suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983). In other words, the court had to determine whether, under the totality of the circumstances, the agents " 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly....' " *Winfrey,* 915 F.2d at 217 (quoting *United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985)).

The district court determined that the manner and duration of the detention of McEaddy was "well within the defined ambit of a *Terry* stop," that is, that the detention was reasonable. Based on the testimony of the agents, the district court concluded that the interview in the dining room was very brief. Once the agents determined that they had probable cause to arrest McEaddy, they terminated the interview until they questioned him again upstairs after rereading him his *Miranda* rights. The court also found it significant that: 1) there was no evidence that the interview in the dining room was conducted in an improper manner; 2) prior to any questioning, McEaddy was given his *Miranda* rights; 3) both the agents and McEaddy were standing during the interview; 4) the dining room, where the questioning in this episode occurred, was open and connected to the living room where the other occupants were detained; and 5) no coercion was used. *Id.* at 475–76. These findings were not clearly erroneous.

■ McEaddy does not challenge the evidence relied on by the court to support its

conclusion, and he does not claim the agents did not have "reasonable suspicion." Mc-Eaddy argues that the detention after the search concluded and before the agents had probable cause to arrest was an exploitation of the initial *Summers* detention. We disagree. Once the search of the premises was completed and resulted in the discovery of drugs and firearms, the agents had reasonable suspicion to focus on any occupant who was present in the home voluntarily or purposefully. Although McEaddy was already handcuffed at this point, the use of handcuffs does not necessarily turn an encounter into an arrest for which probable cause is required. *See United States v. Crittendon,* 883 F.2d 326, 329 (4th Cir.1989). McEaddy was not removed from the home, placed in a squad car, or taken to the police station. *Cf. Richardson,* 949 F.2d at 856–57. Rather, the agents took McEaddy into the adjoining dining room, where he was briefly questioned. Although the intrusion was significant, it was reasonable in light of the significant law enforcement interests and the physical surroundings of the encounter.

We believe that under the facts of this case, McEaddy's continued detention was reasonable to vindicate the agents' suspicions regarding McEaddy's possible connection to the contraband, or to eliminate those suspicions, by giving McEaddy an opportunity to explain the extent of his involvement. We find that the district court committed no error when it determined that the continued detention of McEaddy was reasonable under the Fourth Amendment. We therefore conclude that McEaddy's motion to suppress was properly denied.

## III.

## FOUNTAIN

We now turn to the issues raised in Fountain's appeal.

## A.

Prior to Fountain's jury trial, the government sought to admit the testimony of Fountain's girlfriend, Selma Hill. The prosecutor indicated that Hill's testimony, which was offered "to show intent, *modus operandi,* or plan," would be as follows:

> [T]hat she lived with the defendant on or about the time of the indictment, that she had an ongoing relationship with him, that she stayed in the bedroom with him, and that she saw him sell crack cocaine from the residence on numerous occasions, that it was part of his modus operandi or plan to sell them out of the plastic pill bottles; that he normally kept around ten rocks of crack cocaine in those pill bottles; and that on times when people would come to the house to purchase crack cocaine, he would brandish the firearms if there was a problem in terms of the amount of money which would be charged.

Fountain objected to the proposed testimony on relevancy grounds, arguing that Hill's testimony was irrelevant because Fountain was not indicted for an ongoing criminal enterprise or ongoing conspiracy. Over Fountain's objection, the court admitted the testimony pursuant to Fed.R.Evid. 404(b) after finding that the evidence was probative of Fountain's "*modus operandi* or plan" in carrying out his drug trafficking operations. On appeal, Fountain argues that the district court "abused its discretion" when it allowed Hill to testify about Fountain's involvement in other cocaine sales because the testimony pertained to events that occurred outside the time frame specified in the indictment and, therefore, was not relevant. Fountain also argues that the evidence was "highly prejudicial."

■ Under Fed.R.Evid. 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The rule provides, however, that such evidence may be admissible "for other purposes, such as proof of motive, ... intent, ... plan...." *Id.* In ruling on the admission of 404(b) evidence, the district court also must determine whether "the probative value [of the evidence] is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. Recently, this court, sitting *en banc,* clarified our standard of review of a district court's Rule 404(b) determination:

Although this court has frequently stated that we review 404(b) evidence under an abuse of discretion standard, we believe it is more precise to state the following. First, it must be determined as a matter of preliminary fact whether there is sufficient evidence that the prior act occurred. Second, a legal determination must be made whether the "other act" allegedly committed by the defendant was admissible as evidence of "intent, preparation, [or] plan." *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir.1992) (citations omitted) (*en banc*). Thus, under Rule 404(b), we review for abuse of discretion only that component of the district court's evidence ruling that invokes the balancing of the probative value of the other acts evidence against its prejudicial effect. *Id.* at 1262. We review the underlying admissibility of the other acts evidence under a *de novo* standard.

We conclude that the district court erred in determining that Hill's testimony was admissible as evidence of Fountain's "*modus operandi* or plan." Neither *modus operandi* nor plan were elements of the offenses with which Fountain was charged or were otherwise material, that is, in issue, in the case; therefore, Hill's testimony concerning Fountain's uncharged misconduct tending to prove *modus operandi* or plan was immaterial and inadmissible.

 Rule 404(b) of the Federal Rules of Evidence allows the admission of other acts evidence in order to prove "plan" if the purpose is to establish the doing of a criminal act as a step toward completing a larger criminal plan. The gateway requirement is

that proof of a larger criminal plan is material.[6] A larger criminal plan would be material if the crime charged and the other acts both constituted parts of the larger plan. For example, in *United States v. Nabors*, 761 F.2d 465, 470–71 (8th Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 123 (1985), evidence that defendants robbed hospital pharmacies was admissible to prove design and plan in a drug conspiracy case. In *United States v. Cepulonis*, 530 F.2d 238, 246 (1st Cir.), *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 and *cert. denied*, 426 U.S. 922, 96 S.Ct. 2630, 49 L.Ed.2d 376 (1976), evidence that defendants fired at a police officer during their getaway from a robbery was admissible to show that their plan was to distract the police during the getaway. The existence of the "plan" to steal narcotics in order to distribute them in *Nabors*, and to distract the police to facilitate the robbery getaway in *Cepulonis*, was material because the crimes with which the defendants were charged and the other acts were, in each case, constituent parts of a larger criminal scheme.

Fountain was indicted for activities involving drug possession, firearm violations, and destruction of evidence, activities that occurred on May 8 and June 4, 1991. There was no larger, overall "plan" or goal of which the crimes for which Fountain was on trial and the crimes he previously committed were related parts. That Fountain sold crack out of pill bottles or used firearms in connection with drug trafficking on other occasions does not establish anything with respect to what he did on May 8 and June 4 except to

**6.** One of the less salutary results of adoption of the Federal Rules of Evidence is the virtual disappearance of the once clear distinction between "materiality" and "relevancy." Reference to the familiar common law requirement that a fact, to be provable, must be "material" appears only in Fed.R.Evid. 803(24) and 804(5).

A fact or proposition is "material" if it is properly provable in a case in the sense that it is disputed or, at least, is "in issue." *See* McCormick on Evidence 773 (4th ed. 1992).

A fact or proposition is "relevant" if it has a tendency to make the proposition it is offered to prove more probably so than if the evidence were not introduced. The proposition that the evidence is offered to prove must of course be "material" or the evidence may not be received.

There is no definition of "material" evidence in the Federal Rules. Instead, there is inserted in the definition of "Relevant Evidence" in Fed. R.Evid. 401 a qualifying phrase limiting the introduction of relevant evidence to any fact that is "of consequence to the determination of the action...." We understand Fed.R.Evid. 401 as it is written to preserve the same familiar common law requirement for the admissibility of evidence; to wit, the proffered evidence must be relevant to prove a proposition that is itself "of consequence to the determination of the action," i.e., material to the lawsuit. *See United States v. Carriger*, 592 F.2d 312, 315 (6th Cir.1979).

suggest the forbidden inference that "if he did it before he probably did it again."

Neither was it proper to admit Hill's testimony under the rubric of "*modus operandi.*" Ordinarily, evidence of *modus operandi* may be admitted in cases where the identity of the perpetrator of the crime in question is a contested issue, that is, material, in a case. When identity is in issue, the trial court may admit evidence that the defendant previously committed a different crime using the same or similar *modus operandi* as was employed in the commission of the crime charged to show that the same actor committed both crimes, and thus to prove the identity of the perpetrator of the crime charged. *See United States v. Bakke,* 942 F.2d 977, 983 (6th Cir.1991). Proof that Fountain employed the same *modus operandi* in committing a previous crime as was employed in committing the crime charged would be admissible to prove the perpetrator's identity, *if* identity of the wrongdoer were contested in this case. But Fountain's identity was not a contested issue. It was not his defense, for example, that somebody else committed the crimes with which he was charged, and there was no other justification for proving that Fountain previously had committed narcotics offenses employing a certain *modus operandi.*

Since neither plan nor *modus operandi* was properly in issue, that is, material, in this case (or, in the language of Fed. R.Evid. 401, "of consequence to the determination of the action"), Hill's testimony concerning Fountain's "other crimes" tending to prove plan or *modus operandi* was inadmissible. Nevertheless, we believe that the district court's error in permitting Hill's testimony was harmless. "Where an error is not of constitutional dimension, it is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Martin,* 897 F.2d 1368, 1372 (6th Cir.1990). The uncontradicted testimony of the government agents established that, on May 8, cocaine was found in the bathtub where Fountain was seen to have thrown the pill vials, and that, on June 4, cocaine was found in Fountain's pocket. We believe it more probable than not that the jury would

have reached the same verdict based on the evidence properly admitted at trial, without regard to Hill's "other acts" testimony.

## B.

Fountain's next assignment of error involves Agent Primak's testimony for the government. Early in his testimony, Primak described how the agents executed the warrant of May 8:

> [Primak:] On May 8th, there were approximately eight special agents who participated in the execution of this search warrant. I was about the fourth person through the front door, which is located right here. I had advised two other special agents, and I included myself along with these two, to head to the rear southwest bedroom. I had information that that's where—

At this point, Fountain's attorney interrupted with a hearsay objection. The court overruled the objection on the basis that it was offered "to set the scene," not to prove the truth of the matter asserted. Primak continued, "I had information that that was the likeliest spot or most likely spot that I would find narcotics and/or firearms, that being the bedroom of Joe Fountain." Fountain argues that Primak's statement was hearsay, and that its admission into evidence violated Fountain's Sixth Amendment right to confront the witnesses against him. He also argues that the testimony's prejudicial effect substantially outweighed its probative value.

Contrary to the government's claim that our standard of review on this issue is abuse of discretion, we review *de novo* a district court's conclusion whether proffered evidence is inadmissible hearsay. *Hancock v. Dodson,* 958 F.2d 1367, 1371 (6th Cir. 1992). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The government argues that Primak's testimony was not offered to prove that narcotics and firearms would be found in the bedroom; rather, "the purpose of the evidence was to explain the agents' actions in executing the search warrant." It

was offered to show "why" Primak focused on Fountain's bedroom when he executed the search warrant.

▮ "In some circumstances, out of court statements offered for the limited purpose of explaining why a government investigation was undertaken have been determined not to be hearsay." *Martin*, 897 F.2d at 1371 (citing *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir.1987)). Nevertheless, out-of-court statements offered to explain why an investigation proceeded as it did must be evaluated for "relevancy" under Rule 401[7] and for undue prejudice under Rule 403. *Freeman*, 816 F.2d at 563.

▮ The government makes no reasoned effort to justify the relevancy of the challenged "scene setting" evidence. That Primak had information that narcotics and weapons would be found in Fountain's bedroom was not relevant to prove any matter that was "of consequence to the determination of the action"; "scene setting" least of all. The *reason* Agent Primak searched the back bedroom simply was not a matter in dispute and was not in issue in this case. In other words, it was not material. Otherwise inadmissible hearsay evidence is not made admissible simply because it is claimed to be probative of a fact that is not in issue in the case. The command of the search warrant was Primak's reason for conducting the search. Because the agents' actions needed no explanation, we can conclude only that Primak's "information" was offered to prove the truth of the matter asserted—that guns and narcotics were in the bedroom.

▮ Nevertheless, we believe the district court's error in admitting the hearsay statement was also harmless in light of the overwhelming evidence, properly admitted, that established the presence of guns and narcotics in the home.

### C.

▮ In his final assignment of error, Fountain argues that the district court abused its discretion when it departed upward from the guideline range in determining the sentence to be imposed. According to the presentence report, Fountain's offense level was 20, and he had a criminal history category of I. This provided for a sentencing range of 33–41 months. The presentence report indicated, however, that the criminal history category did not adequately reflect the seriousness of Fountain's criminal history, which included convictions for larceny, second-degree murder, driving with a suspended license, interfering with a police officer, and carrying a concealed weapon. In all, Fountain served three years for these crimes. The presentence report noted that Fountain did not receive points for two misdemeanor convictions and for the murder conviction because of the age of the offenses. Therefore, the report concluded, Fountain's criminal history could warrant an upward departure from the guideline range. Fountain did not object to this portion of the sentencing report.

The district court found that an upward departure was warranted. Noting that the next highest range called for a sentence of 37–46 months, the district court sentenced Fountain to 46 months imprisonment on Counts Two, Four, and Five. The court also ordered Fountain to serve a mandatory consecutive sentence of 60 months for Count Three. Fountain made no objection to the court's decision to depart from the guidelines.

On appeal, Fountain argues that the district court's departure from the guidelines was in violation of the law. He argues that the departure was excessive and unreasonable and that the district court did not adequately state its reasons for imposing an upward departure as required by the guidelines. The government responds that Fountain waived his right to appeal because he failed to object to the departure at sentencing. The government also argues that the district court specified its reasons for departing from the guidelines and that the departure was justified.

Absent "plain error," this court will not address claims of alleged misapplication of the guidelines unless the defendant first

7. *See* n. 6.

raised the claim before the district court. *United States v. Nagi,* 947 F.2d 211, 213 (6th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992).

Under the sentencing guidelines, departures from the guidelines are permitted where "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission...." 18 U.S.C. § 3553(b). Generally, the guidelines do not include sentences that were imposed more than 15 years before the instant offense in the computation of the criminal history score. U.S.S.G. § 4A1.2(e). Fountain's misdemeanor and murder convictions were not considered in determining his offense level because of their age. The guidelines provide, however, that

> [i]f the court finds that a sentence imposed outside this time period is evidence of similar, or serious dissimilar, criminal conduct, the court may consider this information in determining whether an upward departure is warranted under § 4A1.3 (Adequacy of Criminal History Category).

U.S.S.G. § 4A1.2, comment. (n. 8). An upward departure from the guidelines is appropriate when the criminal history category does not adequately reflect the seriousness of a defendant's criminal history, or if the defendant's recidivism demonstrates that he does not take the seriousness of his criminal conduct seriously. U.S.S.G. § 4A1.3; *United States v. Bennett,* 975 F.2d 305, 309–10 (6th Cir.1992); *United States v. Feinman,* 930 F.2d 495, 501 (6th Cir.1991).

The presentence report provided Fountain with notice that a departure might be in order. At sentencing, the court explicitly set forth its reasons for departing from the guideline range, finding that Fountain's criminal history was "dramatically understated" and that his recidivism indicated that he did not take seriously the nature of his criminal conduct. The court's decision to depart was supported by the guidelines and the law of this circuit. We find no plain error and believe that the district court acted within its discretion when it departed upward from the guideline range.

## IV.

Finding no error in the proceedings below that require reversal with respect to either McEaddy or Fountain, we **AFFIRM** the judgments of conviction and sentence in both cases.