28 F.3d 1214
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Marwan AFANEH, Defendant-Appellee.
 No. 93-3900.
 United States Court of Appeals, Sixth Circuit.
 July 12, 1994.
 
 Before MARTIN, RYAN, and SUHRHEINRICH, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 The district court granted defendant's motion to suppress certain statements, but denied his motion to suppress two firearms found pursuant to a search warrant. The government appeals under the authority of 18 U.S.C. Sec. 3731, claiming the district court erred in suppressing the statements made by Afaneh after his arrest. Afaneh cross-appeals, arguing the district court erred in denying his motion to suppress the weapons. We reverse the district court's decision to suppress Afaneh's statements and decline to reach the issue raised by Afaneh.
 
 I.
 
 2
 In early 1993, the Cleveland Police Department conducted a major investigation into food stamp fraud. As part of this investigation, the police targeted a store known as Dave's Drive Thru Mini Mart. The registered owners of the store are two sisters, Intesar Afaneh and Fadwa Sadeq. The utilities are registered in the name of a third person, Awni Shuman.
 
 
 3
 The Cleveland Police sought a search warrant for 25 stores in which undercover officers obtained cash for food stamps, used food stamps to purchase non-qualified items, or both. The evidence regarding Dave's Drive Thru is recounted in paragraph 48 of the supporting affidavit:
 
 
 4
 11625 SUPERIOR, DAVE'S DRIVE THRU MINI-MART & KITCHEN, a store licensed to accept FEDERAL FOOD STAMP COUPONS, on Tuesday, February 2, 1993, an undercover law enforcement officer ordered one (1) fifth of Wild Irish Rose Wine; placed a fifty dollar book of FEDERAL FOOD STAMPS on a turntable and asked "how much cash can I get for the rest of it". The cashier said "36". The officer said "okay" and the cashier gave the officer $36.00 in U.S. Currency and the bottle of wine. On the same day a second undercover law enforcement officer ordered a 40 oz bottle of Old English 800 beer which totaled $1.90. The cashier brought the beer to the counter and the officer gave the cashier one (1) five dollar FEDERAL FOOD STAMP and received three (3) one dollar FEDERAL FOOD STAMPS and ten cents in coin as change.
 
 
 5
 Under federal law, alcohol may not be purchased with food stamps, and food stamps may not be exchanged for cash. A state court judge issued a search warrant, which allowed the officers to search for various items used in food stamp fraud, as well as for firearms. According to testimony given at the suppression hearing, the Cleveland police routinely include firearms in their warrants for the protection of the officers and the public.
 
 
 6
 The Cleveland Police organized a team of five officers to execute the search warrant at each of the 25 stores. Detective Alexander was assigned to head the Dave's Drive Thru search team because he knew Marwan Afaneh. Alexander had arrested Afaneh on arson bombing charges in the early 1980's and was aware that Afaneh had been arrested for food stamp trafficking in the mid 1980's. The police believed that Afaneh was either the manager or the owner of Dave's Drive Thru. Apparently, the registered owners of the store are Afaneh's sisters. Alexander testified at the suppression hearing that he believed Afaneh owned the store because Afaneh drove an expensive car, wore nice clothes and jewelry, and owned two pieces of property.
 
 
 7
 The officers charged with executing the search warrant were instructed to arrest all employees at each of the stores named in the warrant. The officers had no arrest warrants and did not attempt to obtain any. According to Detective Brady, the officer in charge of the case, obtaining arrest warrants was not practical because the police did not have the names of the employees involved in the actual undercover buys and could not obtain those names without revealing the identity of their undercover officers. Brady acknowledged that the police had basic descriptions of the employees involved, but testified that these descriptions were not included in the search warrant or the affidavit used to get the warrant. Brady testified that he had been told by experts at the Department of Agriculture that if one employee at a store was involved in food stamp trafficking, so were all the other employees. Accordingly, he instructed the officers to arrest all the employees at every store. The plan was that the employees would be held in jail until they were booked, and then their photographs would be shown to the undercover officers who made the buys. The employees identified by the officers would be charged and the others would be released.
 
 
 8
 In accordance with their instructions, the officers placed Afaneh under arrest for food stamp trafficking as soon as they entered Dave's Drive Thru. They handcuffed him, gave him Miranda warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and informed him that they had a search warrant. The officers then asked Afaneh whether any weapons were in the store. Afaneh directed the police to a loaded .38 caliber revolver hidden in a paper bag behind some bottles near the cash register. He also told the officers that there was a weapon in his office. That weapon was another loaded .38 caliber revolver and was hidden in a paper bag secreted under a heating duct. Afaneh also told the police that the guns were not his, but rather had belonged to the previous owners of the store. He stated that the current owners might have paid the prior owners for the guns. The officers seized the weapons, as well as other items, and took Afaneh to the jail. Afaneh was not charged with food stamp fraud, but was charged with two counts of being a felon in possession of a firearm.
 
 II.
 
 9
 Before trial, Afaneh moved to suppress both the statements he made after his arrest and the guns found by the police as a result of those statements. The district court held a hearing and then issued a memorandum opinion and order granting the motion, in part. After recounting the facts, the district court found that Detective Brady had failed to articulate a basis for his belief that everyone working at every store named in the warrant was involved in food stamp trafficking. The court also found that this was the only reason advanced for Afaneh's arrest. The court concluded that neither Brady nor Alexander had probable cause to arrest Afaneh. At the time Afaneh was arrested, the police had no evidence to link him to food stamp trafficking and had not yet found the guns which would provide the basis for the later indictment. The police knew only that two employees at the store had committed food stamp violations. As a result of these findings, the district court suppressed Afaneh's statements that led the police to the weapons.
 
 
 10
 The court did not, however, find that the guns should also be suppressed. The government argued that the weapons would inevitably have been discovered and seized pursuant to the warrant. The court agreed that the weapon near the cash register would inevitably have been found, but did not agree that the weapon in the heating duct would have also been found. Moreover, with respect to both weapons, the court held:
 
 
 11
 When a searching party, responding to a lawfully issued search warrant, is engaged in a meticulous search of a property such as authorized in this case, there is always the possibility of an inadvertent discovery of a firearm under circumstances that might be hazardous to the searching party. Consequently, with or without a mandate to seize weapons contained in the search warrant, the court is of the view that it is not unreasonable to inquire about the possibility of firearms on the premises, taking into account the safety of all persons on the premises, be they a part of the searching party or mere bystanders. Consequently, the court will not impose the sanction of suppression as it relates to the recovery of the two weapons.
 
 III.
 
 12
 The government argues that the district court erred in suppressing Afaneh's statements for either of two reasons: (1) the officers lawfully arrested Afaneh, or (2) the officers lawfully detained and questioned Afaneh while executing their search warrant.
 
 A. Afaneh's Arrest
 
 13
 The government contends that the officers had probable cause to arrest Afaneh at the time they walked into the store. According to the government, the search warrant provided probable cause to believe that someone on the premises was committing a crime. Consequently, only minimal additional indicia of individualized suspicion was required to arrest Afaneh. To show this additional requirement, the government points to circumstantial evidence, such as Afaneh's clothes and property, that suggest Afaneh was the manager or owner of the store. Detective Brady also stated that he had been told Afaneh was the manager. The government then turns to very general information linking Afaneh to food stamp trafficking:
 
 
 14
 Because the licensed stores[1] also had to act as conduits or transfer houses for illegal trafficking, they were the major targets of the investigation. The managers or owners of the licensed stores were the most culpable or involved persons, since they were the ones who ultimately had to bank or redeem the illegally obtained food stamps. Moreover, Brady learned from his investigation that all the employees at the store where trafficking occurred were involved in that trafficking.
 
 
 15
 The government also pointed to general information that owners of these stores often place the stores in another person's name to conceal their identities or past records; Dave's Drive Thru was apparently registered in the name of two of Afaneh's sisters.
 
 
 16
 Whether the relevant facts amount to an illegal arrest is a question of law, which this court reviews de novo. The standard for determining the validity of an arrest is well established:
 
 
 17
 Whether that arrest was constitutionally valid depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it--whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.
 
 
 18
 Beck v. Ohio, 379 U.S. 89, 91 (1964).
 
 
 19
 The question, then, in modern media parlance, is what did the officers know about criminal activity on the premises and when did they know it. First, they knew, at the instant they walked through the doors of Dave's Drive Thru, that employees at the store had sold undercover officers alcohol in exchange for food stamps. These transactions violated federal law. Second, they knew that the registered owners of the store were apparently two of Afaneh's sisters, and that the utilities were registered in the name of a third individual. Third, the police knew that Afaneh was somehow connected with the store. They believed he was either the owner or the manager, likely the owner due to the expensive clothes, jewelry, and car he possessed. Fourth, some unidentified person at the Department of Agriculture told the detective in charge that if one employee at the store was involved in food stamp trafficking, all employees were involved. The record does not contain any justification for this assertion. Finally, they knew that managers and owners of licensed food stamp dealers were often conduits for illegal trafficking.
 
 
 20
 The police had been reliably informed that someone at the store was involved in food stamp violations, but they had no solid information to connect Afaneh to the violations. All they had were vague beliefs and suspicions. Without more, without something specifically relating Afaneh to the food stamp violations, the police did not have probable cause to arrest him. The government's case for probable cause hinges on two general assertions: 1) all employees at every store were involved in food stamp trafficking, and 2) managers and owners of licensed stores were particularly likely to be involved in trafficking. The government, however, provides no reliable basis for these assertions.
 
 
 21
 These facts are somewhat analogous to the situation in Beck, where the police stated that some unidentified person had provided some unspecified information that led the officer to arrest the defendant. In Beck, the Supreme Court declared:
 
 
 22
 It is possible that an informer did in fact relate information to the police officer in this case which constituted probable cause for the petitioner's arrest. But when the constitutional validity of that arrest was challenged, it was incumbent upon the prosecution to show with considerably more specificity than was shown in this case what the informer actually said, and why the officer thought the information was credible.
 
 
 23
 Beck at 97. Similarly, the government in this case was required to come forward with more concrete information to support its general assertions. Without more, the government had not established probable cause, and the district court correctly ruled that the police illegally arrested Afaneh.
 
 B. Detention and Questioning of Afaneh
 
 24
 The government maintains that the officers acted reasonably and permissibly in detaining and questioning Afaneh during the execution of the search warrant. Since they were allowed to detain and question Afaneh, it should not matter that they took the detention too far and actually placed Afaneh under arrest.
 
 
 25
 The government relies heavily on this court's opinion in United States v. Fountain, 2 F.3d 656 (6th Cir.), cert. denied, 114 S.Ct. 608 (1993), in arguing that the police officers were allowed to detain and question Afaneh during the execution of the search warrant. The dissent distinguishes Fountain on two grounds. First, it concludes that Fountain addressed a situation where officers "discovered" four individuals during the execution of a search warrant, whereas the officers in the present case had made a prior determination to arrest every employee found at the store. Second, the dissent notes that the officers in the present case immediately placed Afaneh under arrest, while the detainee in Fountain was not arrested until after he made an incriminating statement. The dissent feels this second distinction is especially important because "there is a distinct possibility that Afaneh's responses to the officers' inquiries may have differed had he understood that he was simply being detained during a search."
 
 
 26
 We do not agree that Fountain either can or should be distinguished on either of these grounds. Indeed, we do not think Fountain is distinguishable in any relevant respect from this case. In Fountain, ATF agents had a search warrant for a particular house. When they executed the warrant, they found four people at the residence. All four were moved into one room, where they were handcuffed, given Miranda warnings, and forced to lie face down on the floor during the search. The search revealed narcotics and firearms. After the search, the agents took one of the men, Carlton B. McEaddy, into an adjacent room and questioned him. McEaddy admitted that he was a convicted felon and that he had handled the guns. The agents then took McEaddy upstairs, where he was questioned again and arrested.
 
 
 27
 This court upheld the initial detention of McEaddy during the search pursuant to Michigan v. Summers, 452 U.S. 692 (1981). Summers held that a search warrant contains an implicit authorization permitting officers to detain occupants of a house during the execution of the warrant. During the search at issue in Summers, the officers discovered illegal narcotics. The Supreme Court held that this discovery provided probable cause to arrest the detainee, since he was the owner of the house.
 
 
 28
 Like the search in Summers, the search in Fountain revealed illegal narcotics. This court, however, concluded that the search of the house in Fountain provided only reasonable suspicion with respect to McEaddy, not probable cause. This difference is significant because, as McEaddy was not the owner of the house, the officers could not presume that he knew about the drugs and the guns found during the search. Since the search did provide reasonable suspicion, though, the officers were permitted under Terry v. Ohio, 329 U.S. 20 (1968), to briefly question McEaddy before releasing him. Under Terry, officers are allowed to briefly detain and question a suspect in order to confirm or dispel their suspicions about his involvement in unlawful activity, provided they possess reasonable suspicion concerning that involvement. McEaddy's answers to the officers' questions provided probable cause to arrest him, which, in turn, provided justification for the second interrogation upstairs and the arrest.
 
 
 29
 Here, the search warrant and the allegations in the affidavit supporting the warrant provided the necessary reasonable suspicion for questioning Afaneh. Afaneh was either the manager or owner of a store where undercover officers engaged in two separate illegal food stamp transactions. Thus, under Summers, Terry, and Fountain, the officers were allowed to detain Afaneh and briefly question him while they executed the search warrant.
 
 
 30
 This conclusion is further reinforced by a comparison of the house in Fountain and the store in the present case; both are inherently dangerous places. In Fountain, the officers were searching a drug-trafficking house, a place where guns are often found. Dave's Drive Thru Mini Mart is an inner-city convenience store and is located in a high-crime area where several homicides had recently occurred. Consequently, any reasonable officer would anticipate a significant danger of guns on the premises. In addition, the officer in charge of the search knew that Afaneh, the man running the store, was a convicted felon.
 
 
 31
 The search warrant explicitly authorized the police to search Dave's Drive Thru for weapons. It follows that, if the officers had the court's permission to search for weapons, they should also be allowed to ask a detainee about any guns that might be present in the store. A question is less intrusive than a search and provides important protections for the safety of the officers involved in executing the warrant. Hidden, loaded firearms pose obvious dangers, which can be avoided if the officers are able to locate and secure the guns at the outset of the search.
 
 
 32
 Thus, under existing law, the officers were justified in detaining Afaneh during the execution of the search warrant. They were also justified in handcuffing him during this detention. Unlike our brother in dissent, we do not believe the words "you're under arrest" carry any talismanic significance such that they would cause Afaneh to respond differently than if he were simply informed that he was being detained, especially as Afaneh was given Miranda warnings and knew that he had the right to remain silent.
 
 
 33
 The statements made by Afaneh following his arrest did not follow simply because he had been "arrested" rather than "detained." The police could have asked the same questions and elicited the same statements even if they had not arrested Afaneh. No constitutional right of Afaneh's was violated. Suppressing Afaneh's statements would expand the exclusionary rule past the boundaries currently established by the Supreme Court and by this court. Accordingly, we reverse the district court's decision to suppress the statements.
 
 IV. Refusal to Suppress Weapons
 
 34
 Afaneh contends that the officers found the guns only as a result of his statements. Because the statements followed an illegal arrest, the guns are the fruit of the poisonous tree and should be suppressed. Afaneh argues that the district court erred in using a "public safety" exception to allow the guns.
 
 
 35
 We decline to reach this because we have no jurisdiction to do so. 18 U.S.C. Sec. 3731 grants only the government the right to an interlocutory appeal of a decision to suppress evidence. A defendant may appeal such a decision only after trial. See, e.g., United States v. Eccles, 850 F.2d 1375, 1361-62 (9th Cir.1988); United States v. Andrews, 600 F.2d 563, 565 n. 2 (6th Cir.1979).
 
 V.
 
 36
 For the foregoing reasons, we REVERSE the district court's decision to suppress Afaneh's statements. We decline to reach Afaneh's challenge to the district court's refusal to suppress the weapons.
 
 
 37
 BOYCE F. MARTIN, JR., Circuit Judge, concurring in part and dissenting in part.
 
 
 38
 I concur in the majority's decision not to reach Afaneh's challenge to the district court's denial of his motion to suppress the weapons found during the search of the store in which he worked. In addition, I readily acknowledge the police officers' limited authority under Michigan v. Summers, 452 U.S. 692, 705 (1981), to detain Afaneh, as an occupant of the premises, while conducting the search. I do not believe, however, that this authority extends to a right to interrogate Afaneh, especially as to the ownership of the firearms in question. Accordingly, I respectfully dissent from the majority's conclusion that the district court erred in suppressing the statements Afaneh made following his illegal arrest.
 
 
 39
 The majority reasons that the officers' conduct in this case is indistinguishable from that of the law enforcement agents in United States v. Fountain, 2 F.3d 656 (6th Cir.), cert. denied, 114 S.Ct. 608 (1993). Fountain, however, addressed an issue not relevant here: whether a non-resident of a house could be detained under Summers as an "occupant" of those premises. More importantly, Fountain involved the detention of four individuals whom the officers discovered while executing a valid search warrant. Here, by contrast, the officers decided prior to executing the warrant to arrest any employee found in Dave's Drive-Thru, and immediately arrested Afaneh upon entering the store. As a convicted felon with some knowledge of the prosecutorial process, there is a distinct possibility that Afaneh's responses to the officers' inquiries may have differed had he understood that he was simply being detained during a search. Because this case does not involve merely the brief detention of an occupant during the execution of a search warrant, the officers' conduct in arresting Afaneh without a warrant and without probable cause is not justifiable under the rationale announced in Summers and applied by this Court in Fountain. Thus, the district court properly suppressed Afaneh's statements.
 
 
 
 [1]
 Dave's Drive Thru was a licensed store