*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0101p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SAMUEL DAVID STOCKMAN, D.D.S.,
                                    *Plaintiff-Appellee,*

              *v.*                                              No. 05-1518

OAKCREST DENTAL CENTER, P.C., LOUIS E.
LEONOR, D.D.S., Individually,
                                    *Defendants-Appellants.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-70660—Lawrence P. Zatkoff, District Judge.

Argued: June 6, 2006

Decided and Filed: March 16, 2007

Before: SILER, CLAY, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** David T. Croall, PORTER, WRIGHT, MORRIS & ARTHUR, Cincinnati, Ohio, for Appellants. E. Michael Morris, MORRIS & DOHERTY, Birmingham, Michigan, for Appellee. **ON BRIEF:** David T. Croall, PORTER, WRIGHT, MORRIS & ARTHUR, Cincinnati, Ohio, Clinton Meyering, CALLIGARO & MEYERING, Taylor, Michigan, for Appellants. E. Michael Morris, MORRIS & DOHERTY, Birmingham, Michigan, for Appellee.

        SILER, J., delivered the opinion of the court, in which McKEAGUE, J., joined. CLAY, J. (pp. 13-20), delivered a separate dissenting opinion.

---

## OPINION

---

        SILER, Circuit Judge. Defendants Oakcrest Dental Center ("Oakcrest") and Dr. Louis Leonor appeal a judgment of $479,491.63 in favor of Plaintiff Dr. Samuel Stockman. Defendants allege several trial errors including the erroneous admission of a settlement offer in violation of FED. R. EVID. 408. Because we agree that the district court abused its discretion in admitting the settlement offer and the record demonstrates substantial prejudice, we REVERSE the judgment and REMAND to the district court for a new trial.

1

## I.

In late 1999, Dr. Stockman agreed to sell his dental practice of over forty years to Dr. Leonor and Oakcrest. The sale was completed in January 2000. Pursuant to a side agreement, Dr. Leonor hired Dr. Stockman to work as a dentist at Oakcrest. Dr. Leonor's goal was to use this as an opportunity to attract and retain Dr. Stockman's patients. The parties set no time limit or date of termination. Dr. Stockman began working at Oakcrest four days per week in December 1999, and Oakcrest sent out mailers announcing the move and invited his old patients to remain with him at his new location. Few ever came.

When he began working in 1999, Dr. Stockman had opted to be paid $32.00 per hour rather than receive a percentage of his production. In 2001, Dr. Leonor agreed to increase Dr. Stockman's hourly pay to $35.00 per hour and gave Dr. Stockman additional benefits, including malpractice insurance, paid vacations, and some days off. Not long after, Dr. Stockman asked for a raise to $55.00 per hour because that was the average pay for dentists in the locale. Dr. Leonor rejected the amount because, he claimed, Dr. Stockman was not producing and billing the average amount. It is disputed whether this reason was communicated to Dr. Stockman, though he stated he "had the impression that Dr. Leonor could not afford" to give him a raise. At the time, only one other dentist, Dr. Macunivich ("Dr. Mac"), was being paid $55.00 per hour. But his pay was recalculated every year based upon his prior year's production.

In October 2001, because of his low revenue production, Dr. Stockman's work week was scaled back from four days to three. Dr. Leonor wanted to give the chair occupied by Dr. Stockman to a higher revenue-producing dentist. He hired two other dentists, Drs. Lavasseur and Long, who were both in their thirties. However, neither lasted at Oakcrest very long.

By early June 2002, Dr. Leonor reduced Dr. Stockman's days from three to two, citing Dr. Stockman's continued low production. Dr. Stockman went home that day claiming he was ill. Dr. Leonor called his home and spoke to Mrs. Stockman who informed Dr. Leonor that Dr. Stockman was in bed with flu-like symptoms. Dr. Leonor expressed his relief that Dr. Stockman had not suffered a heart attack.

At the time, Drs. Mac and Bailey had produced between 50 per cent and almost 200 per cent more revenue over the same period, even adjusting for the reduced hours. Based upon this information, Dr. Leonor concluded that Dr. Stockman ought to be terminated. Dr. Leonor claimed that he did not have the heart to terminate Dr. Stockman himself because he "liked the guy a lot," and had someone else inform Dr. Stockman upon his return to the office. Dr. Leonor hired Dr. Don Bui, 33, to replace Dr. Stockman.

Dr. Stockman filed suit in the Eastern District of Michigan in February 2003,[1] alleging violation of the Age Discrimination and Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.*, and the Michigan Elliott-Larsen Civil Rights Act (the "ELCRA"), Mich. L. Ann. § 37.2201, *et seq.* He alleged that he was 73 years old at the time and was subject to disparate treatment because of his age. He alleged he was afforded fewer operatories (rooms in which to do dental work); he was not given a dedicated and competent dental assistant; and new patients who required more expensive treatments were steered away from him, thus reducing his potential to generate more revenue per patient-hour. He also alleged that on three occasions, culminating in a Christmas party in 1999 right after he joined Oakcrest, Dr. Leonor asked whether Dr. Stockman realized he "[was] the oldest dentist" at Oakcrest. Dr. Stockman also cited Dr. Leonor's criticism of certain of his dental practices because they were older methods.

---

[1] Dr. Stockman filed a charge with the EEOC which was dismissed, and the EEOC issued a right to sue letter.

Two years later and a few weeks before trial, attorneys for Dr. Leonor and Oakcrest sent the following letter to Dr. Stockman's attorneys:

Dear Ms. Adams:

I have been authorized by my client to extend an offer of reinstatement of employment to Dr. Stockman.

The specifics of the offer are as follows: Dr. Stockman would be rehired as an associate dentist under the terms of his prior employment. His responsibilities would be identical to those of his prior employment as would be his benefits. Based upon Dr. Stockman's testimony in his deposition (see page 96 of the transcript) we will compensate him on a percentage-based pay plan.

Further, my client is amenable to conducting whatever meetings may be necessary between Dr. Stockman and office staff to address any concerns that Dr. Stockman may have a smooth transition to his return to his employment. My client wishes to convey that, despite its respectful disagreement with Dr. Stockman's claims of age discrimination, there is no animosity toward Dr. Stockman and that every effort will be made to assure professional and hospitable working conditions in the future.

My client would be willing to have Dr. Stockman work immediately.

Please discuss this offer with your client and advise us of his position as soon as possible.

Two days later, Dr. Stockman's attorneys responded:

Dear Mr. Chiasson:

This letter is for settlement purposes only and is in response to the offer of reinstatement set forth in your letter of June 9, 2004.

Dr. Stockman accepts the offer of reinstatement, which he understands to be unconditional. Your letter states that Dr. Stockman's responsibilities ". . . would be identical to those of his prior employment, as would be his benefits." However, your letter then modifies the prior terms of Dr. Stockman's employment by proposing to pay Dr. Stockman ". . . on a percentage-based pay plan."

Dr. Stockman will accept a percentage-based pay plan, namely 40%, as indicated on pages 94-96 of his deposition testimony. Also, to avoid any misunderstandings, we refer you to the terms of employment contained in the April 5, 2001 Application for Employment. For your convenience, we enclose a copy of that document.

We note that the offer of reinstatement is accepted based on those terms of Dr. Stockman's prior employment which *included* four days or 32 hours per week of work. As you know, we have contended that the reduction of Dr. Stockman's hours and/or days was discriminatory. Hence, the offer is accepted based on the presumption that Dr. Stockman will be guaranteed his original terms of employment, except for the hourly rate of pay.

Next, your letter does not address other conditions of Dr. Stockman's employment which we have contended were discriminatory. By way of example, Dr.

Stockman should have the same number of operatories available to him as the younger dentists at Oakcrest; and should have an experienced assistant available to him. Nevertheless, Dr. Stockman has accepted the offer of reinstatement, even if he is only granted one operatory; and even if he is not given an experienced assistant. However, unless such conditions are changed, the discriminatory workplace conditions would remain an issue in the case.

Next, as you know, the offer of reinstatement does not resolve all claims in the case. Among other things, Dr. Stockman is still eligible for back-pay, emotional anguish damages, liquidated damages and attorneys' fees and costs. Of course, we will remain open to discussing settlement of all claims at any time. However, such discussions remain separate and apart from your offer of reinstatement which has been accepted by this letter.

Dr. Stockman has a pre-planned visit with his son's family beginning June 21st, but will be available to begin working on June 28th. Please advise whether Dr. Stockman should call the Oakcrest office manager to arrange recommencing work.

(Together, "the Letters"). Believing that Dr. Stockman's reply was a rejection and counteroffer, Defendants withdrew their offer of reinstatement and Dr. Stockman sought to enforce the contract. The district court refused to enforce the contract because (1) the offer was clearly an offer of reinstatement in exchange for settlement of the entire action, and (2) Dr. Stockman's letter was a rejection and counteroffer.[2] However, the district court denied Defendants' motion to have the document precluded from being admitted into evidence at trial under FED. R. EVID. 408. The district court ruled that the Letters were admissible under Rule 408's "another purpose" exception, and that they could be read into evidence if Defendants presented evidence that Dr. Stockman failed to mitigate his damages.

At trial, Defendants cross-examined Dr. Stockman about job offers he received and refused in the months following his termination. The Letters were then read into the record over defense counsel's renewed objection. While both parties agreed that a limiting instruction was appropriate at the time, the district court did not give one until the jury charge. The district court also refused defense counsel's request to give a "same actor" instruction, which informs the jury that it may infer a lack of intentional discrimination where the same person accused of discrimination also made the decision to hire the plaintiff-employee.

The jury found Dr. Leonor and Oakcrest liable for age discrimination and awarded back pay, front pay, and other damages totaling $479,491.63. The district court denied Defendants' renewed motion for a directed verdict or for a new trial in the alternative.

## II.

Defendants appeal the adverse Rule 408 ruling and other alleged trial errors, arguing that they individually and cumulatively justify a new trial. We review a district court's admission of evidence at trial for an abuse of discretion. *See United States v. Talley*, 164 F.3d 989, 998 (6th Cir. 1999). An abuse of discretion exists if we are firmly convinced that the district court made a mistake in admitting challenged evidence. *See United States v. Wiedyk*, 71 F.3d 602, 608 (6th Cir. 1996). However, we will only reverse a jury's verdict if the error was prejudicial. *See Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 532 (6th Cir. 1989).

---

[2]This order is not appealed.

Here, admitting the Letters was clearly a violation of Rule 408's plain language. Furthermore, the evidence at trial favoring Dr. Stockman was insufficient to overcome the prejudice that inheres in such submissions.

## A.

FED. R. EVID. 408 states:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. . . . This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Dr. Stockman argues that Rule 408 expressly "does not require exclusion when the evidence was offered for another purpose." He contends that the district court correctly ruled that evidence regarding an alleged failure to mitigate constitutes "another purpose" for admissibility.

We heretofore have never addressed whether admitting settlement terms or negotiations thereof to prove or disprove mitigation violates Rule 408. Other circuits have found that such evidence is admissible as serving "another purpose" under Rule 408. *See Bhandari v. First Nat'l Bank of Commerce*, 808 F.2d 1082, 1103 (5th Cir. 1987); *Urico v. Parnell Oil Co.*, 708 F.2d 852, 854-55 (1st Cir. 1983); *Orzel v. Wauwatosa Fire Dep't*, 697 F.2d 743, 757 n.26 (7th Cir. 1983). However, instead of following those decisions, we agree with the holding in *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 826-27 (2d Cir. 1992). There, the court addressed a similar question. An employer whom a former employee had sued for discrimination offered to reinstate the employee in exchange for dismissal of the suit. *Id.* at 824. The employee refused and the employer sought to admit the offer and rejection as evidence of the failure to mitigate. *Id.* at 826. The court rejected the employer's position, holding that "[e]vidence that demonstrates a failure to mitigate damages goes to the 'amount' of the claim and thus, if the offer was made in the course of compromise negotiations, it is barred under the plain language of Rule 408." *Id.* at 827.

Indeed, under both federal and Michigan law, a defendant may raise the defense that the plaintiff failed to mitigate his damages by seeking and accepting employment. *See Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 426 (6th Cir. 1999); *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 27 (Mich. 1994). The goal of mitigation is the prevention of unnecessary economic loss, *see id.*, and therefore mitigation necessarily goes to the amount of a claim. Because disproving mitigation cannot both be a purpose for excluding evidence under Rule 408 – *i.e.*, for "the amount"of the claim – and at the same time be admissible as "another purpose," Dr. Stockman's position is implausible.

Our reading of the statute is harmonious with those instances which we have recognized as constituting "another purpose," outside of those examples in Rule 408, but which do not go to the validity or amount of a claim.

> [T]he exceptions have been used only to admit the occurrence of settlement talks or the settlement agreement itself for "another purpose." *See, e.g., Breuer Elec. Mfg. Co. v. Toronado Sys. of Am.,*

*Inc.*, 687 F.2d 182, 185 (7th Cir. 1982) (holding existence of settlement negotiations admissible to rebut claim that party had no knowledge of suit); *Prudential Ins. Co. of Am. v. Curt Bullock Builders, Inc.*, 626 F. Supp. 159, 165 (N.D. Ill. 1985) (holding occurrence of settlement talks admissible to establish agency relationship); *see also Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 U.S. Dist. LEXIS 1790, Nos. 93 Civ. 5298 and 93 Civ. 8270, 1996 WL 71507, at *6 (S.D.N.Y. Feb. 20, 1996) (compelling discovery of terms of agreement only); *Small v. Hunt*, 152 F.R.D. 509, 511 (E.D.N.C. 1994) (allowing discovery of settlement materials to show a "change in circumstances").

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 981 (6th Cir. 2003). We have also viewed "another purpose" as including the use of settlement agreements to prove facts unrelated to the subject matter of the negotiations or where "the claim was based upon some wrong that was committed in the course of the settlement discussions; *e.g.*, libel, assault, breach of contract, unfair labor practice, and the like." *See Uforma/Shelby Bus. Forms v. NLRB*, 111 F.3d 1284, 1293-94 (6th Cir. 1997) (internal quotation and citation omitted).

Therefore, the district court erred in finding that Defendants "opened the door" to the inclusion of the settlement evidence by offering evidence of Dr. Stockman's failure to mitigate. Where, as here, a party has raised an issue going to the validity or amount of a claim, that is insufficient for admitting settlement offers that go to the same issue because to do so violates Rule 408 on its face. To argue otherwise would eviscerate Rule 408's protection and undermine its clear purpose. It would be unreasonable to expect a party to ever make a settlement offer if doing so forced it into choosing between conceding one or more elements of liability or damages or having the offer admitted against it. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Moreover, the evidence was inadmissible under FED. R. EVID. 403. That rule states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Here, the probative value was nearly non-existent. The offer was made just before trial, two years after termination, and was contingent on settling the case, whereas Defendants' evidence established that Dr. Stockman sought, received, and rejected offers of equivalent employment in the months following his termination. Thus, the Letters were irrelevant to all issues of mitigation except for future pay. However, this mere scintilla of probative value was further reduced by Defendants' offer to concede the issue. A court must estimate the probative value of evidence *ex ante* by "comparing evidentiary alternatives." *See Old Chief v. United States*, 519 U.S. 172, 184-85 (1997). Even though a party cannot offer to concede an element of the case against him so as to preclude certain prejudicial evidence, *see id.* at 186-87 (holding that a party "is entitled to prove its case by evidence of its own choice."), here, the burden of proving a failure to mitigate future pay rested with Defendants, *see Jackson v. Shell Oil Co.*, 702 F.2d 197, 201-02 (9th Cir. 1983); *Rasheed*, 517 N.W.2d at 27. On the other hand, the Letters were inherently prejudicial because a jury could easily have misunderstood that the offer, made on the eve of trial, was an implicit admission of liability or a sign that Defendants thought they might lose at trial. Thus, even under "a maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect," *United States v. Sassanelli*, 118 F.3d 495, 498 (6th Cir. 1997), the district court's admission of the Letters under Rule 403 was an abuse of discretion.

Therefore, the admission of the Letters violated FED. R. EVID. 408, and the district court erred in concluding that Defendants opened the door to such evidence or that it was admissible under Rule 403.

**B.**

Defendants contend that the erroneous admission of the Letters caused irreparable damage to them at trial because of the exceedingly prejudicial nature of the settlement offer. We agree. Generally, a non-constitutional trial error is harmless "unless it is more probable than not that the error materially affected the verdict." *United States v. Fountain*, 2 F.3d 656, 668 (6th Cir. 1993). To make that determination, we examine "the entire record to see if the [alleged error] tended to prejudice the [party]." *United States v. Wiedyk,* 71 F.3d 602, 607 (6th Cir. 1995). By "prejudice," we mean a substantial risk that the jury made a determination of liability on an improper basis – *i.e.*, if the rest of the evidence did not clearly support a finding of liability. *See United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986). We take great pains not to substitute our own judgment for that of the fact-finder, but whenever a court undertakes to determine whether a trial error resulted in prejudice, it inevitably, "to some extent at least, substitutes [its own] judgment of the facts and the credibility of the witnesses for that of the jury." *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967) (citing *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960)).

**1.**

"Prior to the Federal Rules of Evidence, a trial court's failure to exclude evidence of a settlement agreement was generally considered sufficiently prejudicial to warrant a new trial." *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 251 (1st Cir. 1985) (citing *Paster v. Pa. R.R.*, 43 F.2d 908, 911 (2d Cir. 1930)). The prejudice that inheres in offers to settle is patently virulent. "The almost unavoidable impact of the disclosure of such evidence is that the jury will consider the offer or agreement as evidence of a concession of liability." Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S EVIDENCE 408-31 (1991). "As the framers of Rule 408 clearly contemplated, the potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound." *United States v. Hays*, 872 F.2d 582, 589 (5th Cir. 1989). Here, the Letter is conciliatory and offers a quid pro quo for Dr. Stockman to relinquish his cause of action. It therefore begs the question that if Defendants' case were meritorious, why would they settle and why would they rehire him if – as Defendants claim in their defense – Dr. Stockman was slow and unproductive? Thus, the offer suggests that Defendants believed they would lose at trial. "It does not tax the imagination to envision the juror who retires to deliberate with the notion that if the defendants had done nothing wrong, they would not have [offered to settle]." *Id.* Thus, a jury's finding of liability because it mistook the evidence for a tacit admission would certainly be a decision on an "improper basis." *Mendez-Ortiz*, 810 F.2d at 79.

**2.**

The evidence at trial was too insubstantial to overcome the Letters' prejudicial effect. Under the ADEA and ELCRA, an employer may not discharge an employee because of the employee's age. *See* 29 U.S.C. § 623(a)(1); MICH. CODE. ANN.§ 37.2202(1)(a). A plaintiff has the burden of proving that the discrimination was intentional. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (ADEA); *Dubey v. Stroh Brewery Co.*, 462 N.W.2d 758, 758-59 (Mich. Ct. App. 1990) (ELCRA). The standards of proof under ADEA and ELCRA are materially identical, and so for simplicity's sake, we proceed under federal precedents for discrimination claims. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (applying federal law to decide parallel federal and Michigan claims under the ADEA and ELCRA).

An employee may establish a claim by offering either direct or circumstantial evidence of age discrimination. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow

a fact finder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003). Here, there was scant evidence at trial – direct or circumstantial – proving intentional discrimination.

**a.**

The only direct evidence proffered was that Dr. Leonor, on three occasions culminating at a Christmas party in 1999, remarked to Dr. Stockman that he "[was] the oldest dentist" at Oakcrest. There were no witnesses to the first two alleged incidents, and Dr. Stockman could not pinpoint their location nor context. But Dr. Leonor admitted making the remark at the Christmas party. However, his statement hardly proves age animus for a few reasons. First, the Christmas party in question occurred right after Dr. Stockman was hired and before he finalized the sale to Dr. Leonor. Thus, Dr. Stockman did not have to go to work for someone who made him uncomfortable about his age. And because Dr. Leonor did not have to hire Dr. Stockman, it is less likely that he was motivated by animus over Dr. Stockman's age when he terminated him a mere two and a half years later.[3] As we have noted, where the same person hires the employee and fires him within a short period of time, especially where the employee's class has not changed, there is a strong contrary inference of discriminatory intent. *See Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463-64 (6th Cir. 1995). In *Buhrmaster*, we relied upon *Lowe v. J.B. Hunt Transp. Inc.*, 963 F.2d 173 (8th Cir. 1992), for the proposition that it was "incredible . . . that the company officials who hired [an employee] at age fifty-one had suddenly developed an aversion to older people two years later." *Id.* at 463. We share this view. Dr. Stockman was already in his seventies and a member of the protected class when he was hired, and he presented no evidence explaining why Dr. Leonor suddenly harbored antipathy toward his age after just two and a half years.

Second, the statement lacks the required "animus" in that it does not negatively or disparagingly refer to Dr. Stockman's age. *See Rowan*, 360 F.3d at 548-49 (holding that statement was not direct evidence of animus because it was not based upon "inaccurate and stigmatizing" stereotypes). Dr. Stockman claimed he could not recall Dr. Leonor's tone at the time he made the statement. No evidence establishes a causal or correlative connection between the remark and the termination that occurred two and a half years later. "Isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (citation omitted).

**b.**

Absent direct evidence of discrimination, a plaintiff claiming unlawful termination must establish a prima facie case showing that: (i) the employee was in a protected group; (ii) the employee was qualified for the position; (iii) the employee was terminated; and (iv) a comparable non-protected person was treated better, or, the employee was replaced by a person not in the protected class. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1048 (6th Cir. 1998) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts to the defendant to proffer a legitimate, non-discriminatory reason for the termination. *See id.* at 804. Once the defendant proffers such a justification, while an inference of discrimination may still be drawn from

---

[3]To the extent it could be inferred that Dr. Leonor's intentions were to hire Dr. Stockman and then get rid of him after attracting his prior patients, this takes us outside of the realm of direct evidence. *See Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 548 (6th Cir. 2004) (observing that evidence that requires an inference is not direct evidence). For the same reason we reject Dr. Stockman's contention that Dr. Leonor's criticisms of his older dental techniques and his remark about Dr. Stockman's risk of heart attack were direct evidence. These all fall short of being probative when viewed in light of Dr. Mac, 65, who had retained many of his former patients after coming to Oakcrest and was by far the highest producer, and until Dr. Stockman joined, held the dubious distinction of "oldest dentist at Oakcrest."

the plaintiff's prima facie evidence, the mandatory presumption of discrimination drops from the case. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981). The burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143.

Assuming that Dr. Stockman established a prima facie case of age discrimination, little evidence rebutted Defendants' proffered justification that Dr. Stockman had low productivity. Poor performance is a legitimate non-discriminatory reason for terminating an employee. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001). Dr. Stockman's year-over-year revenue production was far below either Dr. Bailey's, who was in his mid-forties, or Dr. Mac's, who was in his mid-sixties. From February 2000 until September 2001, the average monthly revenues attributable to each dentist were: Dr Stockman ($10,429.35), Dr. Mac ($23,759.65), and Dr. Bailey ($17,611.83). The rest of the time Dr. Stockman was at Oakcrest, the numbers were: Dr. Stockman ($10,834.30),[4] Dr. Mac ($25,228.17), and Dr. Bailey ($18,742.64). Dr. Stockman tended to be slower working, often taking more time to complete procedures which also led to the need for more operatories for patient-prep while he completed the previous consultation. Thus, the burden shifted to Dr. Stockman to prove pretext. *See Reeves*, 530 U.S. at 143.

An employee's opinion that he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor. *See Majewski*, 274 F.3d at 1117. "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason (A) has no basis in fact, (B) did not actually motivate the defendant's challenged conduct, or (C) was insufficient to warrant the challenged conduct." *Wexler*, 317 F.3d at 576 (internal citation omitted). Dr. Stockman argued that his poor performance was due to inequitable treatment and allocation of resources. Specifically, he claimed that he was (1) never given a dedicated and competent assistant; (2) only given access to one operatory whereas the other dentists had two or more and that the office refused to book multiple patients for him to work on simultaneously; and (3) supposed to see all or most of the new patients, which did not happen, and the ones he did see were the "table scraps," *i.e.*, they did not require the most expensive procedures.

First, Dr. Stockman's assistant of 15 years, Doreen King, whom he praised as very capable, remained with him for the first nine or ten months of his time at Oakcrest. Yet, there was no difference in productivity between the time she was there and after she left. Dr. Stockman admitted that his other assistants quit and were not fired, and he provided no basis for why the assistants Dr. Leonor hired were unqualified. In any event, the assistants Dr. Stockman did have were dedicated to him at all times.

Second, Dr. Stockman conceded that he was allowed to use the "spillover" operatories when needed and could not say when he was ever denied their use except that he was not allowed to double book – *i.e.*, see more than one patient at a time. However, Donna Brennan testified that she refused to double book Dr. Stockman because his pace was slow, and patients ended up in other operatories for so long that it interrupted other doctors' schedules. Dr. Mac also testified that he typically operated out of one operatory and used the spillover rooms only occasionally.

These points were never rebutted. Even if deemed non-credible, there was no contrary evidence. If Dr. Stockman is correct that Oakcrest devoted fewer resources to him in the first place, this does not prove intentional age discrimination and does not rebut the proffered justification that

---

[4] Because during this latter period, Dr. Stockman was only working three days a week, the report was created by multiplying his average by 1.33 in order to make a valid comparison.

his low revenue per patient-hour militated against dedicating further operatories or assistants. And as discussed, *supra*, the fact that Dr. Mac allegedly received as many or more of these resources than Dr. Bailey casts serious doubt on any inference that age discrimination motivated Defendants' priorities.

Third, there is little evidence to prove the patient manipulation that Dr. Stockman alleges. As an initial matter, Dr. Stockman complains that it was discriminatory for Dr. Leonor to have hired Dr. Lavasseur and Dr. Long because they took some of his new patient allotment away. Though they were both far younger than Dr. Stockman, it was firmly established by Dr. Stockman that there was a general policy of giving the new dentists the new patients in order to fill their schedules. Therefore, Dr. Lavasseur and Dr. Long saw new patients not because they were younger, but because they were the new dentists in the office. This explains why Dr. Stockman did not receive all the new patients, but it does not prove discrimination. A legitimate and bona fide seniority system does not constitute an unlawful employment practice. *See Hazen Paper*, 507 U.S. at 609. Thus, neither office policy nor the ADEA requires that all new patients should have gone to Dr. Stockman.

Dr. Stockman also provided no evidence or even a theory as to how the "good patients" were diverted away from him. He claimed that there were meetings where sometimes new patient assignments were divided up, and yet he chose not to go. Furthermore, repeated testimony established that new non-referral patients were assigned blindly. In other words, at the time they were assigned to a dentist, no one knew what treatment a patient would need. This explanation went uncountered as well.

Dr. Stockman relies heavily on the testimony of Dr. Unsworth, an unaffiliated dentist who manages his own practice. Dr. Unsworth examined production reports and summaries prepared by Dr. Stockman's counsel. He testified that he believed it typical that most of the expensive procedures would come from new patients, and so he thought it odd that Dr. Stockman would have seen one fifth of the new patients in 2000, and yet have less than a fifth of the expensive procedures:

> In the year 2000, Dr. Stockman received 21 percent of the new patients. You would expect that if he was receiving 21 percent of the new patients, that he would have a high percentage down here of procedures that are more expensive, and they're not, they're less, they're less.
>
> Same thing here. In each of these years, he supposedly is receiving the new patients and, as I told you, you're going to receive – you're going to have a group of patients who, in a lot of cases, haven't been to the dentist for 10 to 15 years and they require root canal therapy, very extensive work.
>
> Dr. Macunovich at that period of time was doing what I would expect Dr. Stockman to do, as far as the relationship between the expensive procedures and the numbers of patients. In other words, it just doesn't jive to me that Dr. Stockman was getting the new patients and yet he was not receiving the high percentage of expensive procedures.

However, Dr. Unsworth's conclusion does not follow from his premises. If most of the expensive procedures generally come from new patients, then the percentage of Dr. Stockman's expensive procedures should correlate strongly with the percentage of the new patients he saw because he almost exclusively saw new patients. Thus, it should not be surprising that in 2000, his first year, Dr. Stockman saw 21 per cent of the new patients and had 16 per cent of the expensive procedures (after allowing for the natural period of delay between initial visits and later procedures,

and other minor variances); in 2001 it was 20.6 per cent and 20.7 per cent, respectively; and in 2002 it was 16.2 per cent and 15 per cent, respectively.

Even more damaging is that the documents Dr. Unsworth averted to do not establish that Dr. Stockman saw 21 per cent of the new patients; rather, they say that he had 21 per cent of the *total* patient visits. Because there was no evidence stating the average number of visits per new patient, there is no way to determine what percentage of new patients Dr. Stockman saw without a direct figure which was also absent. Dr. Unsworth conceded these facts. Furthermore, there was no evidence that Dr. Stockman's new patients had a smaller pro rata share of the new procedures. The variance between Dr. Mac's numbers (percentage of new patients to expensive procedures) was explained by the fact that he had pre-existing patients (of which Dr. Stockman had few to none of his own, and also accounted for Dr. Mac's higher number of total patient visits). This would have affected the total number of expensive procedures in the office, causing a concomitant decrease in Dr. Stockman's percentage of expensive procedures. Thus, it would be a stretch for a reasonable person to conclude, based upon the foregoing, that Dr. Stockman only saw the "table scraps."

Therefore, the comparisons to Dr. Mac and Dr. Bailey severely undercut the allegation of age discrimination or pretext, and Dr. Stockman's proffered explanation for his low revenue is largely unsupported by the evidence at trial, thus raising substantial doubt as to whether admitting the Letters was harmless error.

### 3.

When there has been an evidentiary error, we will vacate a jury verdict where the error so altered the total mix of information submitted to the jury that it was substantially likely to have affected the verdict. *See, e.g., United States v. Wesley*, 417 F.3d 612, 622 (6th Cir. 2005); *United States v. Carr*, 5 F.3d 986, 993 (6th Cir. 1993); *Fountain*, 2 F.3d at 668. Here, the Letters' admission was substantially likely to have affected the verdict because they were of an "exceptionally prejudicial character" and were admitted prior to the defense's presentation of its case. Moreover, given the lack of overwhelming evidence in favor of liability, "[the Letters'] withdrawal from consideration by the jury cannot be expected to remove the harm." *Carr*, 5 F.3d at 993 (citing *United States v. Wells*, 431 F.2d 432, 432 (6th Cir. 1970)). Thus, we resolve any lingering doubt in a case like this in favor of vacatur and remand. *Cf. Olitsky v. Spencer Gifts, Inc.*, 842 F.2d 123, 127 (5th Cir. 1988) ("We are not persuaded that the erroneous introduction of this highly damaging statement had no effect on the jury's verdict. The other competent evidence of . . . liability is not sufficiently strong to allow such a conclusion.").

The district court's limiting instruction does not alter our conclusion. Prejudicial evidence can overwhelm the efficacy of palliative jury instructions. An instruction can lessen "to some degree the prejudicial nature of [inadmissible] evidence . . . ; it is not, however, a sure-fire panacea for the prejudice resulting from the needless admission of such evidence." *United States v. Haywood*, 280 F.3d 715, 724 (6th Cir. 2002) (citing *United States v. Garcia-Rosa*, 876 F.2d 209, 222 (1st Cir. 1989)). Here, the Letters were read into evidence fairly early during trial which risked infecting and coloring the balance of the proceedings, especially when no limiting instruction was read until the jury charge, making it all the more difficult to un-ring the bell. Thus, the district court's failure to issue a contemporaneous instruction and its delay in doing so until the jury charge opened Defendants' case to the full brunt of the injury. That, coupled with the lack of overwhelming evidence of liability is of "particular concern" to us and we reverse accordingly. *See Wesley*, 417 F.3d at 622.

Our holding is further buttressed by the purpose underlying Rule 408, which is "the promotion of the public policy favoring the compromise and settlement of disputes that would otherwise be discouraged with the admission of such evidence." *Manko v. United States*, 87 F.3d

50, 54 (2d Cir. 1996) (citation omitted).  In *Goodyear*, we held that the "strong public interest" in encouraging settlement negotiations justified an expanded privilege protecting them from discovery. 332 F.3d at 980. We observed that

> [p]arties are unlikely to propose the types of compromises that most effectively lead to settlements unless they are confident that their proposed solutions cannot be used on cross-examination, or under the ruse of "impeachment evidence," by some future [] party . . . . Parties must be able to make hypothetical concessions, offer creative *quid pro quos*, and generally make statements that would otherwise belie their litigation efforts.

*Id.*  Similarly, parties are no more likely to engage in settlement negotiations under the risk of their admission at trial just because a curative instruction was read during the jury charge.  While the instruction added a veneer of protection, we reject the proposition that any amount of evidence supporting liability, no matter how little, coupled with a limiting instruction read at any time during the trial is sufficient to cure the wrongful admission of Rule 408 evidence.  To hold otherwise would render Rule 408 toothless.

### III.

The district court abused its discretion in admitting the Letters in violation of FED. R. EVID. 408 and 403 because "it is more probable than not that [their admission] materially affected the verdict." *Fountain*, 2 F.3d at 668.  Because we reverse on the Rule 408 issue alone, we do not reach the balance of Defendants' claims on appeal.

REVERSED and REMANDED to the district court for a new trial consistent with this decision.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. The jury's verdict should be upheld, inasmuch as the majority's view of Federal Rule of Evidence 408 rests on an implausible reading of the Rule which cannot be reconciled with the intent of the Rule or the case law that was approved by the advisory committee's note to Rule 408's recent amendment. I would hold that the district court did not abuse its discretion, under the unique circumstances of this case, in admitting the evidence of settlement negotiations. Furthermore, there was substantial evidence admitted at trial to support the jury's verdict. Accordingly, I would affirm the judgment of the district court.

**I.**

Under the Age Discrimination in Employment Act of 1967, Pub. L. 90-902, 81 Stat. 602 ("ADEA") (codified as amended at 29 U.S.C. § 621 *et. seq.*), it is "unlawful for an employer . . . to discharge any individual . . . because of such individual's age."[1]   29 U.S.C. § 623.  A plaintiff alleging a claim under the ADEA is required to mitigate damages. *See Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 426 (6th Cir. 1999). The defendant, however, bears the burden of demonstrating that the plaintiff failed to mitigate damages. *See Shore v. Fed. Express Corp.*, 777 F.2d 1155, 1158 (6th Cir. 1985) (sex discrimination); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003). An offer from the defendant to rehire the plaintiff in his previous position is relevant to the issue of mitigation; if the offer is unconditional, a defendant can use the plaintiff's refusal to accept the offer as evidence that the plaintiff failed to mitigate damages. *Nagarajan v. Tenn. State Univ.*, 187 F.3d 637 (Table), No. 98-5169, 1999 WL 551360, at *4 (6th Cir. July 19, 1999) (unpublished) (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982)).

In the case at bar, the substance of the settlement discussions at issue is contained in two letters (collectively the "Letters"). Defendants sent Plaintiff a letter "extend[ing] an offer of reinstatement of employment." J.A. at 564. Plaintiff sent Defendants a letter that "accept[ed]" the offer of reinstatement, which Plaintiff understood to be unconditional, but interpreted the acceptance as not resolving all of his claims. J.A. at 565. Defendants claimed that their offer was conditional upon the release of Plaintiff's claims; Plaintiff then sought an order to enforce Defendants' offer of reinstatement, which the district court denied. The district court construed Defendants' offer as a settlement offer, and Plaintiff's response as a rejection-and-counter-offer. Plaintiff also argued that, in the event that the Letters did not constitute an agreement, he should be allowed to introduce evidence of the withdrawn offer to respond to Defendants' claim that he failed to mitigate damages; Defendants argued that evidence of the Letters was barred by Federal Rule of Evidence 408. The district court denied Plaintiff's motion as premature, stating that, "as a tactical decision," Defendants might not argue that Plaintiff failed to mitigate damages. J.A. at 58. After it become clear that Defendants intended to argue that Plaintiff failed to mitigate damages, the district court held that Defendants had a choice–they could argue mitigation, in which case evidence of the Letters could be admitted to rebut the claim that Plaintiff failed to mitigate damages, or in the event they did not argue mitigation, the evidence of the Letters would be excluded. If the evidence was admitted, the district court proposed (and Plaintiff agreed to) an instruction limiting the evidence to the issue of mitigation.

---

[1]Plaintiff also sought relief under Michigan's Elliot-Larson Civil Rights Act, Mich. Comp. Law § 37.2101 *et. seq.*  Section 37.2202 makes it unlawful for an "employer . . . [to] discharge . . . an individual . . . because of . . . age." For the sake of simplicity, the discussion in this dissent focuses on federal law.

At trial, Defendants put the issue of mitigation into play by arguing that Plaintiff refused to accept employment offers that were available to him for reasons that were pretextual or unreasonable. Defendants' theory of mitigation rested in part on convincing the jury that Plaintiff was not disposed to continue working as a dentist. As Defendants summarized the evidence at closing, Plaintiff made "excuses" for not finding employment, and did not have "the attitude of a man who wants to get back to work." J.A. at 553.

The district court did not abuse its discretion when it held that, pursuant to Rule 408, Defendants opened the door by offering mitigation evidence, and hence Plaintiff could offer evidence that he was willing to accept what he interpreted to be an unconditional offer of employment. Although Rule 408 bars the admission of "[e]vidence of . . . offering . . . a valuable consideration in . . . attempting to compromise a claim . . . to prove . . . [the claim's] amount," the Rule "does not require exclusion when the evidence is offered for another purpose." When a party seeks to admit evidence of a settlement offer made by an opposing party to rebut the opposing party's claim that the party seeking admission of the settlement offer failed to mitigate damages, that evidence is offered for "another purpose" under Rule 408. The evidence that Plaintiff was immediately ready to resume employment with Defendants was unquestionably relevant to the issue of mitigation. This evidence was properly admitted under Rule 408 to demonstrate that Plaintiff was willing to mitigate damages, and the district court gave an instruction limiting the use of the evidence to that purpose.

The most analogous case to the matter at hand is *Urico v. Parnell Oil Co.*, 708 F.2d 852, 853-54 (1st Cir. 1983). There, the First Circuit upheld the district court's admission of settlement evidence offered for the purpose of mitigation. *Id.* at 854-55. The case involved an auto accident where Parnell Oil Co.'s ("Parnell") truck rear-ended the Uricos' truck on April 11, 1977. *Id.* at 853. The Uricos had leased their truck to a third party; as a consequence, they did not learn about the accident until June of 1977. *Id.* In August, when the truck had been repaired, the Uricos demanded that Parnell's insurer, Bankers and Shippers Insurance Co. ("B & S"), pay to them the cost of the repairs to the truck plus $1,000 per week in damages resulting from their loss of the use of the truck. *Id.* at 853-54. B & S refused, but offered to pay for the repairs if the Uricos dropped their loss-of-use claim. *Id.* at 854. At trial, the Uricos sought to introduce the settlement offer to show that B & S's refusal to pay for the repairs resulted in its failure to mitigate damages. *Id.* at 854-55. The court reasoned that the Uricos had a clear duty to take reasonable steps to mitigate damages, and the settlement evidence was admissible to demonstrate that B & S "unreasonably held [the Uricos'] truck hostage." *Id.* Because the evidence was only offered on the issue of mitigation, it is unlikely that the *Urico* court would have allowed the evidence to be admitted had mitigation not been at issue.

*Pierce v. F.R. Tripler & Co.*, the case most strongly relied upon by the majority, is not to the contrary. 955 F.2d 820, 826-28 (2d Cir. 1992). In *Pierce*, the Second Circuit upheld the district court's refusal to admit settlement evidence for mitigation under Rule 408. *Id.* at 823. The case involved an age discrimination suit where Pierce claimed that, in May of 1986, he was passed over for promotion to the position of General Manager in favor of a younger candidate. *Id.* In September, the defendant offered Pierce another financial position, although it was unclear whether accepting that position required a release of all of Pierce's claims. *Id.* at 824. Pierce declined to accept the offer at the expense of his claims. *Id.* The district court refused to allow the defendant to admit this evidence, and the court of appeals affirmed. *Id.* at 826-28. The court of appeals held that the evidence went to the "amount" of the damages, and therefore was barred by Rule 408, although the court engaged in only the most cursory discussion of what constituted "another

purpose" for which evidence is admissible under the Rule.[2]  *Id.*  Thus, *Pierce* is distinguishable on its facts.  In the instant case, the party opposing the admission of settlement evidence had raised the issue of the duty to mitigate damages by contending that Plaintiff failed to do so.  By contrast, in *Pierce*, the party opposing the admission of the settlement evidence had not put the duty to mitigate damages into play.  There is something deeply troubling about a defendant using Rule 408 settlement negotiations to place the plaintiff in a lose-lose situation, as occurred in *Pierce*:  Accept the offer and the plaintiff must sacrifice his claims; decline the offer and the plaintiff has failed to mitigate damages.  Where, as here, the defendant opens the door to mitigating evidence, no such unfairness occurs.

In addition to being consistent with *Urico* and the disposition of *Pierce*, the district court's holding–that evidence of the Letters was admissible if and only if Defendants opened the door by arguing that Plaintiff failed to mitigate damages–is also consistent with the examples of "other purposes" set forth in the text of Rule 408.  Specifically, this holding accords with Rule 408's allowance of settlement evidence offered to "negat[e] a contention of undue delay."  The fact that Rule 408 uses the word "negate" suggests that, while evidence of a settlement may be relevant to *rebut* evidence that a party engaged in undue delay, this evidence cannot be admitted unless the door is first opened by a party raising the issue of undue delay.  *See* Charles Alan Wright and Kenneth W. Graham, Jr., 23 Fed. Prac. & Proc. § 5312 (supp. 2006) ("[T]he offeror cannot himself raise the issue of delay as a justification for the admission of the evidence.").  Evidence that a party failed to mitigate damages is analogous to evidence that a party's claim is invalid because of undue delay.  Although both types of evidence ultimately go to the "validity" or the "amount" of the claim, neither type of evidence "does [] so via any inference as to the belief [on the part of the offeror] in [the claim's] validity arising from the offer to compromise."  *Id.*  Since using the evidence for this purpose does not ask the factfinder to engage in impermissible reasoning–"because the defendant made the offer to settle, he must be liable"–using settlement evidence to negate a contention that the plaintiff failed to mitigate damages constitutes "another purpose" for which evidence is permissible.

This analogy also demonstrates the flaw in the majority's simplistic claim that the "plain language" of Rule 408 excludes evidence that is relevant to the mitigation of damages because this evidence goes to the "amount" of the claim.  According to the majority, "[t]he goal of mitigation is the prevention of unnecessary economic loss . . . therefore mitigation necessarily goes to the amount of a claim."  Majority Op. at 5.  Although this argument has some surface appeal, a close examination of Rule 408 demonstrates that this reading of the Rule must be rejected.  Rule 408 does not exclude all evidence of settlement agreements.  Under the majority's reading of Rule 408, evidence of undue delay would be inadmissible, because it goes to "liability for . . . a claim."  Fed. R. Evid. 408.

Likewise, the majority's reading of Rule 408 is inconsistent with most or all of the formidable body of case law defining other permissible purposes.  This body of law has developed in the thirty-plus years that Rule 408 has been in effect, and these purposes were recently approved by the advisory committee's note to the 2006 amendment.  *See* Fed. R. Evid. 408 advisory committee's note (2006 amendment).  Take, for example, the case of *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir. 2000), which was cited with approval in the advisory committee's note

---

[2]The *Pierce* court also rejected the defendant's contention that a defendant should always be able to introduce his own settlement offer.  The court reasoned that, were a party allowed to introduce his offers, this rule could "bring with it a rash of motions for disqualification of a party's chosen counsel who would likely become a witness at trial." *Id.* at 828.  An attorney cannot try a case and testify as a witness because testimony from the offeror would often require rebuttal testimony from the offeree.  The offeror could force the offeree to face the choice of allowing the offeror's testimony to go unrebutted or forcing the offeree to forgo counsel of his choice.  *Id.*  The advisory committee has explicitly affirmed *Pierce*'s rationale to the extent that it forbids an offeror from presenting his own offer.  Fed. R. Evid. 408 advisory committee's note (2006 amendment).

to the 2006 amendment. In *Athey*, the plaintiff, Athey, alleged, *inter alia*, that the defendant Farmer's Insurance Co. ("Farmers") (1) was liable to Athey for breach of contract; and (2) had acted in bad faith by failing to investigate Athey's claims and delaying his settlement. *Id.* at 360. In support of his bad-faith claim, Athey was allowed to introduce evidence that Farmers had attempted to require him to release his bad-faith claim as a condition of its offer to settle his breach of contract claim. *Id.* at 361, 362. Under the majority's "plain language" approach, the evidence should be excluded: Because the settlement evidence clearly "went to" the issue of Farmer's liability for bad faith, the evidence would be excluded because the evidence is "offered to prove [Farmer's] liability." *See* Fed. R. Evid. 408. This reading of the Rule cannot be correct. The district court did not abuse its discretion in concluding that evidence offered to rebut a claim that Plaintiff failed to mitigate damages was offered for "another purpose."

## II.

Even though Rule 408 should not have barred the evidence that Dr. Stockman was willing to return to work for Defendants, such evidence still must clear the hurdle of Federal Rule of Evidence 403. Under Rule 403, the district court may exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. "It is well settled that a trial judge's discretion in balancing the probative value of evidence against its potential for unfair prejudice is very broad." *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999). In reviewing the district court's evidentiary decisions under Rule 403, the trial court must give "'the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *Paschal v. Flagstar Bank*, 295 F.3d 565, 576 (6th Cir. 2002) (quoting *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988)).

In conducting its analysis under Rule 403, the majority ignores the above rule, trivializing the probative value of the Letters and ignoring the district court's efforts to minimize whatever prejudice might have resulted from their admission. The evidence that Plaintiff "accepted" Defendants' offer was relevant on at least three different theories: (1) the evidence was relevant to future pay; (2) the evidence was directly relevant to whether Plaintiff attempted to mitigate his damages for the brief time period between the date of the settlement counter-offer and the end of trial, approximately one month; and (3) the evidence was relevant to whether Plaintiff's reasons for rejecting other offers of employment were pretextual or unreasonable. While the majority may be correct that (1) is of limited probative force, it completely ignores the other two bases of relevance. The fact that the settlement counter-offer was relevant to the sincerity of Plaintiff's refusal to accept other offers of employment is highly significant. During Plaintiff's cross-examination, and again at closing, Defendants attempted to demonstrate that Plaintiff did not accept other offers of employment for reasons that were pretextual or unreasonable. Plaintiff testified on cross-examination that he declined to pursue several job opportunities, for reasons that included the philosophy of the dental practice, the fact that one dental office was set up for left-handed dentists, and the fact that one dental practice was too far from his home. Defendants attempted to impeach Plaintiff by demonstrating that his professed motives were not his true motives, and argued during closing that his efforts to mitigate damages were not reasonable, and in truth, Plaintiff did not have a genuine desire to work. The fact that Plaintiff immediately accepted the "offer" to return to work for Defendants tends undermine this argument, by supporting an inference that he did desire work, which lends credibility to his proffered reasons for refusing other employment. Contrary to the majority's contention, this testimony is relevant not only to future pay, but to the issue of mitigation over the entire period subsequent to Plaintiff's termination. Majority Op. at 7; *see Morris v. Clawson Tank Co.*, 587 N.W.2d 253, 258 n.5 (Mich. 1998) (trier of fact must determine whether the plaintiff refused to accept employment of a "like nature" and can consider "the type of work, the hours worked, the compensation, the job security, working conditions, and other conditions of employment" in making the determination).

Moreover, while the majority is correct that there is a possibility of prejudice in admitting evidence of a settlement offer made shortly before trial, the majority's analysis fails to consider the factors ameliorating this potential prejudice. In his closing, Plaintiff addressed the settlement evidence only in the context of damages, and the district court gave a limiting instruction, stating that the evidence was "received for, and is only to be considered, for the limited purpose of [the jury's] deciding whether plaintiff failed to mitigate his damages, and is not to be considered by [the jury] in making a determination as to whether the defendants discriminated against the plaintiff on the basis of age." J.A. at 558. This factor is relevant to the proper weight of the potential prejudice in the Rule 403 balance. Fed. R. Evid. 403, advisory committee's note (1972 proposed rule).

When truly considering the evidence with the maximum reasonable view of the probative value and the minimum reasonable view of the potential prejudice–rather than ignoring sources of probative value and factors that decrease the potential prejudice–it cannot be said that the district court abused its "broad discretion," even if other jurists would have reached a different outcome if faced with the issue *de novo*. Accordingly, the evidence was not inadmissible under Rule 403.

### III.

The evidence adduced at trial was certainly sufficient for the jury to find in Plaintiff's favor. A plaintiff can succeed on a claim for age discrimination by presenting circumstantial evidence of age discrimination under the familiar burden-shifting model outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 510 (6th Cir. 2004). In order to establish a prima facie case, a plaintiff must prove that: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) after he was rejected, a substantially younger applicant was selected." *Id.* at 511 (citing *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001)); *Browning v. Dep't of Army*, 436 F.3d 692, 695 (6th Cir. 2006).

Here, Plaintiff presented evidence at trial that established all the elements of the prima facie case. Plaintiff was seventy-three years old at the time of his termination; he was terminated; he was qualified to practice dentistry; and he was replaced by Dr. Bui, who was thirty-three years old. Because Plaintiff established a prima facie case, the burden shifted to Defendants to proffer a legitimate, nondiscriminatory reason. Defendants' legitimate, nondiscriminatory reason was that Plaintiff was fired because of his low productivity. Under the *McDonnell Douglas* framework, after a defendant produces a legitimate nondiscriminatory reason for a plaintiff's discharge, the burden shifts back to the plaintiff to show that the defendant's proffered reason was a pretext for discrimination. *Browning*, 436 F.3d at 695.

The plaintiff can make this showing by demonstrating that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). "The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are 'factually false.' The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (citation omitted). Under the second showing, "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.*

Viewed in the light most favorable to Plaintiff, a reasonable jury could have found that, to the extent that Plaintiff was less productive than Defendants' other dentists, his lower productivity did not motivate Defendants' decision to terminate him. First, Plaintiff adduced evidence from which a jury could conclude that Defendants' purported legitimate reason was an after-the-fact concoction. Plaintiff testified that he was never informed that his productivity was a problem. Plaintiff also put forth evidence suggesting that negative comments regarding his productivity were only added to his personnel file after Defendants made the decision to terminate him.

Second, Plaintiff submitted evidence that tended to prove that Defendants hampered his productivity by not providing Plaintiff with his fair share of dental resources. Plaintiff presented evidence that he was not given a second operatory to work out of, and that, after his full-time assistant left in October of 2000, Plaintiff was not given an experienced and dedicated assistant to replace her. And, importantly, Plaintiff presented evidence that the new patients needing expensive procedures were channeled away from him and to the other dentists. Plaintiff proved this point through the testimony of Theresa LeClerc, who worked at the front desk of the dental office, who testified that she was given a directive to steer new patients to other new dentists, but was never given that directive with respect to Plaintiff when he was the newest dentist. Plaintiff also proved this point by the expert testimony of Dr. Unsworth. Dr. Unsworth testified that, because a higher percentage of new patients had not been receiving dental care in the past (as opposed to returning patients, who, by definition, were receiving dental care in the past), new patients as a group tended to require more expensive procedures than returning patients.[3] Dr. Unsworth then compared the *total number of patient visits* (including new and returning patients), expressed as a percentage by dentist, to the *total number of expensive procedures*, again expressed as a percentage by dentist. The idea is that, if a dentist was assigned more than his pro rata share of new patients, (and the evidence showed that it was Defendants' policy to assign new patients to the newest dentist), then that fact would be reflected by that dentist having a share of expensive procedures that exceeded his share of total patient visits. This is because the number of new patients that made up that dentist's share of total patient visits would be greater, and hence the percentage of expensive procedures would be greater. The evidence suggested that Plaintiff was *not* being allocated a greater-than-pro-rata share of new patients. For example, in 2000, when Plaintiff was the newest dentist, Plaintiff had 21% of patient visits, but only 16% of the expensive procedures. Dr. Unsworth testified that had Plaintiff been assigned the new patients, Plaintiff's percentage share of expensive procedures would have been in the range of 40% to 50% of the expensive procedures.

Third, Plaintiff produced evidence of remarks made by Defendant Leonor that, while not direct evidence of discrimination,[4] suggested that Defendant Leonor was highly conscious of Plaintiff's age. On at least three and possibly more occasions, Defendant Leoner told Plaintiff that he was "the oldest dentist that [Defendants] have ever had at Oakcrest." J.A. at 296. Defendant Leonor also testified that, in the context of terminating Plaintiff, he asked Plaintiff's wife about Plaintiff's plans to retire–which could allow a factfinder to infer that Defendant Leonor thought that, because of Plaintiff's age, it was time for Plaintiff to discontinue his employment.

---

[3] These patients, for example, may not have engaged in preventative care, or may have been induced to come to the dentist by the onset of a specific ailment.

[4] Direct evidence is "evidence which, if believed, requires the conclusion that [age discrimination] was at least a motivating factor in the employer's actions." *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Plaintiff's evidence does not constitute direct evidence because it requires, at the minimum, the inference that Defendants' concerns about Plaintiff's age were a motivating factor in Defendants' decision to terminate Plaintiff. The evidence nonetheless constitutes probative circumstantial evidence tending to show that Defendants' purported legitimate reason for Plaintiff's termination was pretextual.

This non-exhaustive summary of the evidence presented by Plaintiff at trial demonstrates that Plaintiff presented a cohesive, plausible story for his termination: Defendants did not want to invest in growing Plaintiff's practice because of his age, so instead they deprived him of resources and then terminated him to make way for a dentist who Defendants believed, because of his age, would make better business sense over the long-term. Were this in fact what happened–and a jury could easily find that it did–Defendants would have violated the ADEA.

When reviewing the trial court's denial of a new trial, this Court is not "free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Barnes v. Owen-Corning Fiberglas* Corp., 201 F.3d 815, 821 (6th Cir. 2000) (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)). Instead, the jury's verdict must be upheld if it could reasonably be reached by a reasonable jury. *Duncan*, 377 F.2d at 52. The majority, instead of considering the facts in the light most favorable to Plaintiff, draws inferences for the benefit of Defendants at every turn. Despite Plaintiff's testimony that his performance was hampered by not having a full-time assistant after October of 2000, the majority concludes that "the assistants Dr. Stockman did have were dedicated to him at all times." Majority Op. at 9. This is inconsistent with Plaintiff's testimony that he did not have a dedicated and experienced assistant. Dedicated and experienced assistants are important to maintaining productivity, because they can anticipate the dentist's needs, thereby speeding up the dentist's work. Plaintiff testified that the assistants that were provided to him were inexperienced, and did not remain with him for long periods of time. Plaintiff also testified that Defendants were responsible for hiring his assistants, and that he had no part in the hiring process.

The majority next attempts to discredit Plaintiff's evidence that his restriction to one operatory impeded his productivity. The majority claims that Plaintiff was not allowed to book two operatories because he was slow, and that "Dr. Mac[unovich] . . . testified that he typically operated out of one operatory and used the spillover rooms only occasionally." Majority Op. at 10. The majority, again ignoring the record and inappropriately viewing the facts in the light most favorable to Defendants, avers that "there was no contrary evidence." Majority Op. at 10. This overlooks Plaintiff's testimony that Dr. Bailey and Dr. Macunovich each "had two [operatories] apiece, two apiece, and I had one." J.A. at 290. A jury could have chosen to credit Plaintiff's evidence that Dr. Macunovich had two operatories, and disbelieved Dr. Macunovich's testimony that he typically operated out of one. Moreover, in light of Plaintiff's evidence that Defendants' claim that Plaintiff worked slower was a pretext, a jury could believe that Plaintiff was not allowed to double-book operatories because of discrimination, rather than because he was slow.

The majority next asserts that, even if Defendants *did* dedicate fewer resources to Plaintiff, "this does not prove intentional age discrimination and does not rebut the proffered justification that [Plaintiff's] low revenue per patient-hour militated against dedicating further operatories or assistants." Majority Op. at 10. This statement demonstrates an utter failure to understand Plaintiff's claim: Plaintiff claims that, to the extent that his revenue per patient-hour was low, it was *because* Defendants were not devoting resources to him. A jury could have credited this explanation.

Finally, the majority's statement that Plaintiff had "no evidence or even a theory as to how the 'good patients' were diverted away from him" is patently false. Majority Op. at 10. The majority admits that there was a policy in place to give new patients to the new dentists. Yet it ignores LeClerc's testimony that, despite the fact that she was instructed to steer new patients to other new dentists, she was never instructed to direct new patients to Plaintiff. More troubling, the majority appears to misunderstand the evidence presented by Dr. Unsworth. The majority states that "it should not be surprising that in 2000 . . . Dr. Stockman saw 21 per cent of the *new* patients and 16 per cent of the expensive procedures . . . ; in 2001 it was 20.6 per cent and 20.7 per cent, respectively; and in 2002 it was 16.2 per cent and 15 per cent, respectively." Majority Op. at 11.

(emphasis added).  Although Dr. Unsworth did state that Plaintiff saw "21 percent of the *new* patients," J.A. at 516 (emphasis added), clearly Dr. Unsworth merely made an error in speaking. He later stated that the numbers he was referring to were "the total number of patient visits," and reading his testimony as a whole, it is clear that Dr. Unsworth was never laboring under a misunderstanding as to this point.[5]  As the newest dentist, Plaintiff was supposed to be allocated more than his pro rata share of new patients–the fact that his percentage of expensive procedures is approximately equal to or less than his percentage of *total* patient visits is strong evidence that this did not occur, given the unchallenged assertion that new patients, as a group, more frequently tended to require more expensive procedures.  Dr. Unsworth testified that, if Plaintiff were truly getting the new patients, he should have had 40% to 50% of the expensive procedures.[6]  The majority simply disregards this testimony.

When the evidence is considered in the light most favorable to Plaintiff, it is clear that a reasonable jury could find in Plaintiff's favor.  Contrary to the majority's contention, substantial evidence supports the jury's verdict.

**IV.**

Because this case represents the unusual situation in which evidence of a settlement agreement was properly admitted, and there was substantial evidence supporting the jury verdict, I would uphold the judgment below.  Accordingly, I respectfully dissent.

---

[5]As the majority realizes, the documents to which Dr. Unsworth referred discussed the total number of patient visits.  Majority Op. at 11.

[6]The point is simply that if Plaintiff were assigned the new patients he was supposed to receive, and if new patients more frequently needed expensive procedures, then Plaintiff's percentage share of expensive procedures should exceed his percentage share of total patient visits.  Dr. Unsworth testified that this would mean that Plaintiff should have had about a 40% share of the expensive procedures, to go with his 20% share of total patient visits.  The fact that Plaintiff did not supports the conclusion that Plaintiff was not in fact allocated the new patients; or if he was, he was only allocated the "table scraps." *See* Majority Op. at 11.